CENTRAL IMPROVEMENT CO. et al. v. CAMBRIA STEEL CO. et al.

GUARDIAN TRUST CO. v. SAME.

(Circuit Court of Appeals, Eighth Circuit. October 22, 1912.)

Nos. 3,489, 3,490.

1. APPEAL AND ERROR (§ 719*)—REVIEW ON APPEAL IN EQUITY—ERRORS NOT ASSIGNED.

An appeal in a suit in equity in a federal court invokes a trial de novo in the appellate court, and under rule 11 of the Circuit Court of Appeals (193 Fed. vii, 112 C. C. A. vii) a plain error not assigned on such an appeal may be, and ought to be, considered where the failure to consider it would result in great injustice.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 2968–2982; Dec. Dig. § 719.*]

2. RAILROADS (§ 30*)—REORGANIZATION—PARTICIPATION OF STOCKHOLDERS—LIABILITY OF NEW COMPANY FOR DEBTS OF OLD COMPANY.

A reorganization of an insolvent railroad company, by which both its mortgage bondholders and its stockholders in exchange for their bonds and stock are given an interest in the new company, which purchases the property of the old company at a foreclosure sale made pursuant to such plan of reorganization, and by consent of the old company and its stockholders, is fraudulent in law as to unsecured creditors of the old company whose claims are left unpaid, and renders the new company liable for the claims of such creditors.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. § 32; Dec. Dig. § 30.*

Liabilities enforceable against reorganized corporations, see note to Armour v. E. Bement's Sons, 62 C. C. A. 147.]

3. RAILROADS (§ 30*)—REORGANIZATION—PARTICIPATION OF STOCKHOLDERS—LIABILITY FOR DEBTS OF OLD COMPANY.

Bondholders and stockholders of an insolvent railroad company, a dock company, and a belt line company formed a plan of reorganization and for consolidation of the properties of the three companies. Pursuant to such plan, a new company was organized and its stock and bonds exchanged for those of the three companies on an agreed basis. It then purchased the property of the railroad company at foreclosure sale, and,

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

having by the exchanges acquired a large majority of the bonds and stock of the belt line company, caused the mortgage securing its bonds to be foreclosed by a formal suit and bought in its property. *Held,* that the transaction was fraudulent as to unsecured creditors of the belt line company whose claims were left unpaid, and that the new company was liable for such claims; the property of the belt line company which was bought in being largely greater in value than their amount.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. § 32; Dec. Dig. § 30.*]

**4.** RAILROADS (§ 30*)—REORGANIZATION—RIGHTS OF CREDITORS OF OLD COMPANY—ESTOPPEL.

The reorganization agreement having provided for payment of the unsecured indebtedness of the belt line company and authorized the committee to use certain securities of the new company for that purpose, such an unsecured creditor, which was also owner of bonds and stock of the belt line company, was not estopped from enforcing its unsecured claim because it joined in the reorganization agreement and exchanged its bonds and stock pursuant thereto.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. § 32; Dec. Dig. § 30.*]

**5.** EQUITY (§ 426*)—PRINCIPLES GOVERNING GRANTING OF RELIEF—HE WHO SEEKS EQUITY MUST DO EQUITY.

A court of chancery will condition its grant of relief to a complainant with the enforcement of any just claim of the defendant which the complainant ought in equity and good conscience to pay, although on account of the statute of limitations or for some other reason defendant might not be able affirmatively to enforce it.

[Ed. Note.—For other cases, see Equity, Cent. Dig.·§§ 999, 1000; Dec. Dig. § 426.*]

**6.** REFERENCE (§ 24*)—NATURE OF ORDER—CONSENT. ·

Where the issues joined in a suit in equity were referred to a master by the court on its own motion, a subsequent stipulation by the parties that new issues, raised by additional pleadings, should be referred to the same master, did not make the reference one by consent, especially as to issues referred prior to the filing of the stipulation.

[Ed. Note.—For other cases, see ·Reference, Cent. Dig. § 40; Dec. Dig. § 24.*]

**7.** APPEAL AND ERROR (§ 1017*)—REVIEW—FINDINGS OF MASTER.

Even though a reference was by consent of·parties, such fact does not preclude the Circuit Court of Appeals from correcting manifest errors.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 3996–4005; Dec. Dig. § 1017.*]

**8.** RAILROADS (§ 169*)—MORTGAGES—PRIORITIES OF LIENS AND MORTGAGES—AFTER-ACQUIRED PROPERTY CLAUSE.

A corporation purchased real estate and issued its stock, equal at par value to the purchase price, to a railroad company which furnished the money to pay to the vendors. The railroad company then pledged the stock to secure an indebtedness of its own. *Held,* that a prior mortgagee of the railroad company acquired no lien upon such stock by virtue of an after-acquired property clause in the mortgage which it could enforce as against the pledgee without first paying the debt secured by the pledge.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. §§ 536–548; Dec. Dig. § 169.*]

Appeals from the Circuit Court of the United States for the Western District of Missouri; John F. Philips, Judge.

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

Creditors' suit in equity by the Cambria Steel Company against the Kansas City Suburban Belt Railroad Company, Guardian Trust Company, and others. From the decree, Guardian Trust Company and Central Improvement Company and others appeal. Reversed.

George H. English, Jr., and Edward P. Gates, both of Kansas City, Mo. (D. J. Haff and E. C. Meservey, both of Kansas City, Mo., on the brief), for appellants.

Frank Hagerman, of Kansas City, Mo., for Cambria Steel Co.

Samuel Untermyer, of New York City, and Samuel W. Moore, of Kansas City, Mo., for Kansas City Southern Ry. Co.

Newel H. Clapp, of St. Paul, Minn., and Enoch J. Price, of Chicago, Ill., for Shedd and others.

Before SANBORN, Circuit Judge, and MARSHALL and WM. H. MUNGER, District Judges.

WM. H. MUNGER, District Judge. While the parties to these controversies are numerous, the questions involved upon the appeal require consideration only of acts of the following named companies, to wit: The Cambria Steel Company, which, for convenience, will herein be designated "Cambria Company"; Kansas City, Pittsburg & Gulf Railroad Company, herein called "Gulf Company"; Port Arthur Channel & Dock Company, herein called the "Dock Company"; Kansas City Suburban Belt Railroad Company, herein called the "Belt Company"; Kansas City Southern Railway Company, herein called the "Southern Company"; Guardian Trust Company, herein called the "Trust Company"; the Provident Life & Trust Company, herein called "Provident Company."

The Gulf Company was a railroad extending from Kansas City to Port Arthur on the Gulf of Mexico; the Dock Company was a local company having terminal facilities at Port Arthur; the Belt Company was a belt line railroad having terminal facilities at Kansas City, Mo. Each of these companies had outstanding bonds secured by mortgages upon its properties. The Cambria Company was a judgment creditor of the Belt Company. The Trust Company owned a large amount of the stock and bonds of both the Gulf Company and the Belt Company and was also a creditor of the Belt Company. The Gulf Company, having defaulted in the payment of interest upon its mortgage, a suit for foreclosure was instituted, and a committee of bondholders was selected to originate and propose a reorganization plan. This committee proposed a plan of reorganization by which the properties of the Gulf Company, the Dock Company, and the Belt Company should be acquired and organized into or operated as a single new company. This committee formulated a plan of reorganization, by the terms of which it was proposed that a new company be organized to acquire the properties of the three mentioned companies. Their plan was published and submitted to the bond and stockholders of each of the companies, the committee declaring that it had formulated and adopted said plan as the basis of the reorganization of the railroad system, having for its ultimate purpose the unification of the main

line and terminals into one ownership and under one management; that such object was sought to be accomplished by having the Gulf Company, when reorganized, acquire the capital stock of the other two companies, namely, the Dock Company and the Belt Company, and, having thus acquired the control and possession, to thereafter adjust the bonded indebtedness standing against the properties of the Belt Company and Dock Company by retiring the existing bonds, and issuing therefor new bonds, the basis of the plan being that the property of the existing Gulf Company should be sold in the foreclosure proceeding, purchased by the committee, and a successor company organized, to which the property so purchased should be conveyed, together with the stock and bonds of the Dock Company and the Belt Company. If sufficient of the stock and bonds of those companies should be deposited with the committee, in exchange for bonds and stock of the new company to be organized, then those properties to be acquired. By that plan it was said the following results would be obtained: The new company to be organized would own the property of the Gulf Company and also the bonds and capital stock of the Belt and Dock Companies, and thereby all three properties would be under one corporate ownership, management, and control. Said stock and bonds so purchased of the Belt and Dock Companies to be pledged under the mortgage to be given by the company to be organized for the payment of: (1) Floating debts and existing car trust obligations; (2) adequate provision for working capital for future acquirements. It was also stated that it was contemplated that said reorganized or new company should issue $30,000,000 50-year 3 per cent. gold bonds, $18,000,000 of the bonds to be used for the conversion of the bonds of the Gulf Company, $1,330,000 for the conversion of the old or existing bonds of the Belt Company, $817,500 new bonds for the old or existing bonds of the Dock Company, $3,000,000 of the new bonds to be sold for the necessary cash requirements of the new company, $3,802,500 to be reserved for the future requirements of the new company, $3,050,000 of new bonds to be used in acquiring existing outstanding bonds of some other companies that were subsidiary companies of the Belt Company.

It was proposed in the plan that the holders of securities of the Gulf Company were to receive for their bonds 75 per cent. in new bonds and 50 per cent. in new preferred stock; the stockholders of the Gulf Company, upon paying $10 per share, were to receive one share of new common stock for each share of the old stock.

The bondholders of the Belt Company, for their old bonds, were to receive 133 per cent. of new bonds and 25 per cent. in new preferred stock; the stockholders of the Belt Company were to receive for each share one-quarter of a share of new preferred stock and three-quarters of a share of new common stock.

The bondholders of the Dock Company were to receive for their old bonds 50 per cent. in new bonds, 50 per cent. in new preferred stock, and 50 per cent. in new common stock; the stockholders of the Dock Company, for each share of their stock, were to receive three-quarters of one share of new common stock.

The stock and securities of the respective companies were largely deposited according to the committee's plan. A decree was entered in the foreclosure against the Gulf Company on February 5, 1900, sale had and the property thereunder acquired by the Southern Company on March 19, 1900, the date on which it was organized and incorporated.

The Southern Company issued a new mortgage and bonds, also its stock, according to the terms of the reorganization plan, and such bonds and stock were exchanged for the bonds and stock of the old companies, the holders of which had deposited their bonds and stock in accordance with the proposed plan. The Trust Company accepted the plan and deposited its stock and bonds which it held of the Belt Company and received in new bonds and stock its proportionate amount under the reorganization agreement.

Although the Southern Company had acquired practically all of the bonds and stock of the Belt Company in exchange for its new bonds and stock, in accordance with the reorganization plan and agreement, and acquired possession and control of the property of the Belt Company, the Provident Company, trustee in the Belt mortgage, filed its bill of foreclosure and asked for the appointment of receivers. The master's finding in this regard was as follows:

'"On September 6, 1900, nearly six months after the incorporation of the Southern Company, the receivers were appointed for the Belt Company, at the instance of the Southern, and through the Provident Company, as trustee, which filed the foreclosure bill; the foreclosure decree being made on November 6, 1901, and the sale on December 31, 1901, to the Southern Company."

The Trust Company was a party to that foreclosure suit, and before the decree was entered asked leave to file an amended supplemental answer, stating in effect that the reorganization plan had been promulgated in the interests of creditors of the Belt Company as well as bondholders and stockholders, and that it had been intended to pay the Trust Company's debt, the reorganization committee having often promised to pay it until about the time of the institution of the foreclosure suit, and that the purpose of such suit was to vest in the Southern Company title to all the Belt Company property, free from the payment of that company's floating debt, which was a fraudulent purpose. It asked that the Southern Company be made a party to the cause, etc. The court denied the leave to file such answer, but provided, however, as a condition of the denial, that complainant (Provident Company) should, within five days thereafter, file a stipulation that the decree should be without prejudice to the claim of the Trust Company. The last paragraph of the foreclosure decree was as follows:

"This decree is entered on the express condition to which the complainant has assented, that it shall be without prejudice to and shall not bar the right of the Guardian Trust Company, or its receiver, to plead and insist in any litigation now pending or hereafter brought, that the Kansas City Southern Railway Company by virtue of the manner in which it was organized, or for any other reason, is legally or equitably liable for and bound to pay the unsecured debts of the Kansas City Suburban Belt Railroad Company, either in full or to pay them to the extent of the value of any property heretofore ac-

quired by it from the Kansas City Suburban Belt Railroad Company, or that may hereafter be acquired by it from said company by virtue of these foreclosure proceedings, and without prejudice to the right of said Guardian Trust Company or its receiver, to plead and insist, in any pending litigation or litigation hereafter brought, that the members of the reorganization committee of the Kansas City, Pittsburg & Gulf Railroad Company assumed to pay and are liable to pay the unsecured debts of the Kansas City Suburban Belt Railroad Company existing at the time the alleged reorganization was undertaken."

On September 6, 1900, the Cambria Company filed a creditor's bill against the Belt Company, Trust Company, and other companies, the object and purpose of which was to recover certain securities belonging to the Belt Company, which had been deposited with the Trust Company as security for the Belt Company's indebtedness to the Trust Company, claiming in its bill that the Belt Company was not in fact indebted to the Trust Company, and made an application for the appointment of a receiver, and on that day receivers were appointed for the Belt Company upon the joint application of the Cambria Company and the Provident Company complainant in the foreclosure suit against the Belt Company.

In the suit brought by the Cambria Company issues were joined, the receivers appointed for the Belt Company filed a cross-bill against the Trust Company, denying indebtedness upon the part of the Belt Company to the Trust Company, but claiming that the Trust Company was in fact a debtor of the Belt Company. The case was, in November, 1900, referred to Hon. Shannon C. Douglass, as special master, to take the testimony, etc. The hearing proceeded before the master, and after much testimony had been taken an order was made by the court in February, 1905, pursuant to a stipulation of parties, admitting the Southern Company as a party and giving it leave to file a petition of intervention, and the Southern Company filed its petition of intervention on the 27th day of that month, claiming that the various securities held by the Trust Company to secure its indebtedness against the Belt Company were covered by the mortgage which was foreclosed against the Belt Company, and sought to recover such property by its bill of intervention.

The hearing before the master extended over several years, upwards of 34,000 pages of testimony was taken, and the master, on the 21st of May, 1910, filed his report, which comprises 381 pages of the printed record. The evidence has not been brought to this court; hence all questions of fact as found by the master are conclusive upon the parties on this appeal.

The master found that the evidence did not support the claim of the Cambria Company and recommended that its bill be dismissed for want of equity. The master found upon the accounting that there was due from the Belt Company to the Trust Company the sum of $639,658.86.

The master found fully the facts as to the reorganization plan, the acquiring by the Southern Company of the stock and bonds of the Gulf Company, Dock Company, and Belt Company, the issuing of its new stock and bonds to the holders of the bonds and stock

of those companies, in exchange for the bonds and stock of the respective companies held by them, as we have heretofore stated.

The master found, as a matter of law, that the Southern Company was not liable for the debts of the Belt Company.

The Trust Company filed exceptions to the report of the master, among other things to the finding that the Southern Company was not liable for the floating indebtedness of the Belt Company, giving as reasons therefor that that was not an issue in the case, and no finding thereon should have been made by the master.

Various exceptions were also filed by the Central Improvement Company, one of the defendants in the action.

Subsequently, a hearing was had by the court upon the report of the master and the exceptions thereto, the exceptions were over-ruled, and the report of the special master was in all things approved and confirmed, and a decree entered in accordance with the findings and recommendations of the master, from which the Trust Company and the Central Improvement Company have prosecuted their appeal.

The decree also provided that, it appearing that all costs incurred by the Cambria Company prior to November 20, 1901, had been paid by it, no further costs should be taxed against the Cambria Company, nor should any costs which had been paid by the Cambria Company be chargeable against any other parties to the action. The remaining costs were taxed by the court one-third against the Trust Company and two-thirds against the Belt Company, to be paid by the Belt Company and Southern Company.

The assignments of error relied upon in this court are: (1) That the court erred in including in said decree the finding that the Southern Company did not assume or agree to pay or become liable for the indebtedness owing by the Belt Company to the Trust Company. (2) That the court erred in requiring the Central Improvement Company and its receivers to convey to the Southern Company the properties specified in the decree. (3) That the court erred in adjudging that one-third of the costs of this action be paid by the Trust Company.

The principal question, and the one which involves the merits of the controversy, rests upon the correctness of the finding of non-liability upon the part of the Southern Company for the debt found due from the Belt Company to the Trust Company, for, as stated by counsel for the Southern Company in their brief:

"The decision of the question of the Southern Company's liability for the debts of the Belt Company was necessary to a disposition of the case. The defense pleaded by the Trust Company to the effect that the Southern Company had assumed or become liable for the indebtedness of the Belt Company was, if true, a perfect answer to the intervening petition. It said, in substance, to the Southern Company: 'Even though you may have the legal or equitable title to the collateral securities or to the properties represented by them, yet they were pledged by the Belt Company to secure its indebtedness, you assumed and agreed to pay that indebtedness, and a court of equity will not award you possession of the securities until you discharge your own obligation. Any relief to you must be conditioned upon your payment of the Belt Company's indebtedness.'"

This contention that, if the Southern Company had become liable for the indebtedness of the Belt Company to the Trust Company, that was a perfect defense to the intervening petition of the Southern Company, is sound and unanswerable, and after a careful review of the record in this case this court holds, and it decides, that the issue whether or not the Southern Company was indebted to the Trust Company for the debt of the Belt Company to the Trust Company was a material and decisive issue between the Trust Company and the Southern Company in this case which it was the duty of the master and the court below to consider and decide. The remarks of this court in Guardian Trust Co. v. Kansas City Southern Ry. Co., 171 Fed. 43, 96 C. C. A. 285, 28 L. R. A. (N. S.) 620, that "the liability of the Southern Company to pay the debts which the Trust Company alleges in the actions at law it has promised to pay is not an issue and cannot be determined in this suit in equity," upon which counsel rely, must be construed, as must all opinions of the courts, in the light of the facts and the issue then in hand. The issue before the court in that case was whether the causes of action in the state court were so identical with the cause of action theretofore pending in the court below that an injunction should be issued to stay the prosecutions of the actions in the state court. This court held that the suit in the Circuit Court was in equity, that it related to the title and ownership and the right to a conveyance of certain specific property, while the actions at law brought by the Trust Company against the Southern Company in the state court were purely in personam to recover the alleged debts of the Southern Company, that in the suit in equity the same relief was not sought as in the actions at law, and that the prosecutions of the actions at law in the state court constituted no interference with the suit in the court below. There was nothing in the decision in that case in conflict with the conclusion which has now been reached.

[1] The master and the court below decided that the Southern Company was not indebted to the Trust Company for the indebtedness of the Belt Company to the latter. The Trust Company requests this court to review that decision upon the report of the master and contends that as a matter of law the Southern Company is so indebted upon the facts which the master finds. The Southern Company objects to this review on the ground that the only exception to the master's conclusion here and the only assignment of error in the affirmance thereof by the court below was placed upon the ground that that issue was not judicable in this suit. But an appeal in a suit in equity invokes a trial de novo in the appellate court and entitles the appellant to a just decree. Dowagiac Mfg. Co. v. Lochren, 143 Fed. 211, 74 C. C. A. 341, 6 Ann. Cas. 573; Blease v. Garlington, 92 U. S. 1, 8, 23 L. Ed. 521. And under rule 11 (193 Fed. vii, 112 C. C. A. vii) of this court a plain error not assigned may be, and ought to be, considered where the failure to consider it would result in a great injustice. United States v. Bernays, 158 Fed. 792, 86 C. C. A. 52; New York Life Ins. Co. v. Rankin, 162 Fed. 103, 108, 89 C. C. A. 103; United States v. Tennessee, etc., R. R. Co., 176 U. S. 242, 256, 20 Sup. Ct. 370, 44 L. Ed. 452. And in view of the facts that

the issue here has been long and persistently contested below, that exception was taken and assignment of error made regarding it, though upon an erroneous ground, that both parties have prepared exhaustive briefs upon the question which the Trust Company asks us to review, that neither party can be taken by surprise, and that a failure to review the legal conclusion below would result in an unjust final adjudication of the issue under consideration, we are constrained to consider and decide it.

It is claimed that the Southern Company is liable for the debt of the Belt Company to the Trust Company because it knowingly acquired the property of the Belt Company in the execution of a scheme to exclude the Trust Company's unsecured claim against the Belt Company for $639,685.86 from the benefit of the Belt Company's property and to apply that property by an exchange of stock and bonds and a mere formal and not actual foreclosure sale to the benefit of the stockholders of the Belt Company.

In Louisville Trust Co. v. Louisville, etc., Ry., 174 U. S. 674, 19 Sup. Ct. 827, 43 L. Ed. 1130, which was an action brought by a creditor to set aside a sale under a foreclosure as being in fraud of its rights, for the reason that such foreclosure was had in the interests of the stockholders as well as the bondholders, Mr. Justice Brewer, rendering the opinion of the court, said:

"The questions in this case are novel and important. They arise on the foreclosure of certain railroad mortgages, and suggest to what extent the same rules and considerations obtain in them as in the foreclosure of ordinary mortgages upon real estate. It goes without saying that the proceeding in the foreclosure of an ordinary mortgage on real estate is simple and speedy. No one need be considered except the mortgagor and mortgagee, and if they concur in the disposition of the foreclosure it is sufficient, and the court may properly enter a decree in accordance therewith. * * *

"But this court long since recognized the fact that in the present condition of things (and all judicial proceedings must be adjusted to the facts as they are) other inquiries arise in railroad foreclosure proceedings accompanied by a receivership than the mere matter of the amount of the debt of the mortgagor to the mortgagee. We have held in a series of cases that the peculiar character and conditions of railroad property not only justify but compel a court entertaining foreclosure proceedings to give to certain limited unsecured claims a priority over the debts secured by the mortgage. It is needless to refer to the many cases in which this doctrine has been affirmed. It may be, and has often been said, that this ruling implies somewhat of a departure from the apparent priority of right secured by a contract obligation duly made and duly recorded, and yet this court, recognizing that a railroad is not simply private property, but also an instrument of public service, has ruled that the character of its business, and the public obligations which it assumes, justify a limited displacement of contract and recorded liens in behalf of temporary and unsecured creditors. * * *

"We notice, again, that railroad mortgages, or trust deeds, are ordinarily so large in amount that on foreclosure thereof only the mortgagees, or their representatives, can be considered as probable purchasers. * * *

"We must therefore recognize the fact, for it is a fact of common knowledge, that, whatever the legal rights of the parties may be, ordinarily foreclosures of railroad mortgages mean, not the destruction of all interest of the mortgagor and a transfer to the mortgagee alone of the full title, but that such proceedings are carried on in the interests of all parties who have any rights in the mortgaged property, whether as mortgagee, creditor, or mortgagor. * * * Assuming that foreclosure proceedings may be carried on

. to some extent at least in the interests and for the benefit of both mortgagee and mortgagor (that is, bondholder and stockholder), we observe that no such proceedings can be rightfully carried to consummation which .recognize and preserve any interest in the stockholders without also recognizing and preserving the interests, not merely of the mortgagee, but of every creditor of the corporation. In other words, if the bondholder wishes to foreclose and exclude inferior lienholders or general unsecured creditors and stockholders, he may do so; but a foreclosure which attempts to preserve any interest or right of the mortgagor in the property after the sale must necessarily secure and preserve the prior rights of general creditors thereof. This is based upon the familiar rule that the stockholder's interest in the property is subordinate to the rights of creditors; first of secured and then of unsecured creditors. And any arrangement of the parties by which the subordinate rights and interests of the stockholders are attempted to be secured at the expense of the prior rights of either class of creditors comes within judicial denunciation."          '

A "transfer of property by a debtor with a reservation of an interest therein to himself" is always voidable by his creditors as against a debtor and all claiming under him· with notice of his act, and a transfer by stockholders of a corporation of its property with a preservation of an interest in themselves is ' equally voidable against all who take the property with notice of their act.   In Montgomery-. Web Co. v. Dienelt, 133 Pa. 585, 596, 19 Atl. 428, 430 (19 Am. St. Rep. 663), a new corporation was formed, and part of its stock was issued to the stockholders, and a part of it was issued to the creditors of an old corporation for their holdings, and all the property of the old corporation was transferred to the new corporation.   A single creditor of the old corporation assailed the transaction.   The Supreme Court of Pennsylvania said:

"Under such circumstances they (the stockholders) were bound to take notice of the nature of the transaction and to know that equity would still regard the property as a trust for the payment of existing debts, and would follow it on behalf of the creditors until it should get into the hands of innocent purchasers for value.  Such purchasers they were not.  The old stockholders were not purchasers for value at all, and the new stockholders were not innocent, for they knew, or were bound to take notice, of the taint in their co-adventurers' title.  We are of the opinion that, as to the stockholders in the Aronia Company, this was a transfer of property by a debtor with the retention of an interest in himself within the settled rule of law that makes such transfers void as against creditors, and that, as to the Aronia creditors who became new stockholders in the Montgomery Company, they took with such notice as prevents them from claiming now as innocent holders for value against the appellants as execution creditors of the old corporation.  It is not worth while to cite authorities for these principles; they are settled and familiar."

In Chicago, R. I. & P. Ry. Co. v. Howard, 74 U. S. (7 Wall.) 392, 409 (19 L. Ed. 117), the leading case upon this subject, where a foreclosure sale of the property of a corporation was made pursuant to an arrangement whereby 84 per cent. of the purchase price was to go to its bondholders and 16 per cent. to its stockholders, the Supreme Court said:

"Equity regards the property of a corporation as held in trust for the payment of the debts of the corporation and recognizes the rights of creditors to pursue it into whatsoever possession it may be transferred, unless it has

passed into the hands of a bona fide purchaser; and the rule is well settled that stockholders are not entitled to any share of the capital stock, nor to any dividend of the properties until the debts of the corporation are paid."

The facts and the ruling in that case are thus stated in the syllabus:

"A sale under foreclosure of mortgage of an insolvent railroad company, expedited and made advantageous by an arrangement between the mortgagees and the stockholders, under which arrangement the mortgagees, according to their order, got more or less of their debt (100 to 30 per cent.), and the stockholders of the company the residue of the proceeds—a fraction (16 per cent.) of the par of their stock—held fraudulent as against general creditors not secured by the mortgage, and this although the road was mortgaged far above its value, and on sale in open market did not bring near enough to pay even the mortgage debts; so that, in fact, if there had been an ordinary foreclosure, and one independent of all arrangement between the mortgagees and the stockholders, the whole proceeds of sale would have belonged to the mortgagees."

In Central of Georgia Ry. Co. v. Paul, 93 Fed. 878, 884, 35 C. C. A. 639, 645, the Circuit Court of Appeals of the Fifth Circuit said:

"There is no substantial dispute that the appellee Mary F. Paul was and is a creditor of the Central Railroad & Banking Company of Georgia, and the question is whether the Central of Georgia Railway Company is liable for her demand. The case shows that the sale of the railway properties under the foreclosure at the suit of the Central Trust Company, the sale of the collateral securing the floating debt claims, and the sale of the 'overflow property,' all were in pursuance of a reorganization plan, which was carried out, and resulted in the transfer of all the property and assets of the Central Railroad & Banking Company of Georgia to the Central of Georgia Railway Company; and the active participating reorganizers were not only the creditors of the Central Railroad & Banking Company of Georgia, secured by mortgage and otherwise, but included as well the stockholders of said company; so that, for the purposes of the present case, it is an indisputable fact that, notwithstanding all the sales of property and other transactions in liquidation, the stockholders of the Central Railroad & Banking Company of Georgia retained their interest and rights, and by virtue thereof are now either stockholders of the new organization, Central of Georgia Railway Company, or are otherwise provided for, and that the new company has acquired, and now holds, all the former property and assets of the old company. It would seem from this state of facts that the appellee has the right to look to the new company for the payment of her claim."

[2] Indeed, it is settled law, that:

"A reorganization of an insolvent railroad company by which both its mortgage bondholders and its stockholders, in exchange for their bonds and stocks, are given an interest in the new company which purchases the property of the old company at a foreclosure sale made pursuant to such plan of reorganization, and by consent of the old company and its stockholders, is fraudulent in law as to unsecured creditors of the old company whose claims are left unpaid and renders the new company liable for the claims of such creditors." Northern Pacific Ry. Co. v. Boyd, 177 Fed. 804, 101 C. C. A. 18; Luedecke v. Des Moines Cabinet Co., 140 Iowa, 223, 118 N. W. 456, 32 L. R. A. (N. S.) 616; Hurd v. New York & Commercial Steam Laundry Co., 167 N. Y. 89, 60 N. E. 327.

[3] The case under consideration falls directly under this rule of law. A scheme was devised and proposed for the benefit of the stockholders and bondholders of the Belt Company, the Gulf Company, and the Dock Company, as the reorganization agreement reads:

"For the reorganization of the Kansas City, Pittsburg & Gulf Railroad Company, and its property, and also, if necessary, for the reorganization of the Kansas City Suburban Belt Railroad Company and the Port Arthur Channel & Dock Company and their properties, and for the consolidation of said corporations, if such consolidation can be lawfully made, and is found to be practicable *either with or without foreclosure of either or all of said properties, or by means of the acquisition of the stock or other securities of either or all of said corporations,* or in any other manner that may be deemed by said committee to be most practicable and feasible."

That scheme was accepted, approved, and executed by the stockholders and bondholders of the Belt Company and by the Southern Company for their benefit to the exclusion of the Trust Company's unsecured claim from all benefit from the property of its debtor, the Belt Company. A new company, the Southern Company, was organized, the stockholders and bondholders of the old company, the Belt Company, in exchange for their stock and bonds were offered and took an interest in the new company, the stockholders took for their $4,700,000 of stock in the old company about $1,857,000 of the preferred stock and about $3,562,500 of the common stock of the Southern Company, in all about $5,419,500 in stock at its par value, and the bondholders took about $1,330,000 of the preferred stock and $250,000 of the bonds of the Southern Company, in all about $1,580,-000 at their par value, for their $1,000,000 of bonds of the old Belt Company, and, after the new company had obtained in this way more than 89 per cent. of the bonds and more than 97 per cent. of the stock of the old company, it purchased the property of the old company at a formal, but not an actual, foreclosure sale, made pursuant to this plan of reorganization at the instigation of the Southern Company as holder of 89 per cent. of the bonds of the Belt Company and with its consent as holder of more than 97 per cent. of the stock of the Belt Company. And what was the actual effect of this entire performance? The property of the Belt Company was transferred to a new company, and its stockholders preserved for themselves an interest in that property. Before the transaction they had common stock of the Belt Company of the par value of $4,700,000, and the Belt Company owned its property, after the transaction the stockholders had preferred stock of the Southern Company of the par value of about $1,857,000 and common stock of that company of the par value of about $3,562,500, and the Southern Company owned the property of the Belt Company. But a sale or transfer by stockholders of the property of their corporation in which they preserve an interest, whether that sale or transfer be by deed, by mortgage, by judgment, by foreclosure sale, or by any other means, is fraudulent and voidable against the unsecured creditors of their old corporation, and a purchaser who takes and converts such property to its own use with knowledge of the facts becomes legally liable to pay the unsecured debts of the old corporation, at least to the extent of the value of the property so taken and converted. The value of the property of the Belt Company so taken and converted by the Southern Company was many times the amount of the Belt Company's debt to the Trust Company. The conclusion is irresistible,

and the judgment of this court is, that the Southern Company which, pursuant to this scheme and in its execution, purchased the Belt Company's property at the formal foreclosure sale with full knowledge of the scheme and of the fact that by its execution the stockholders of the Belt Company were appropriating to themselves the benefits of the property of the Belt Company which in law and in equity belonged to the unsecured creditors of that company, became legally liable to pay and is indebted to the Trust Company to the amount of the debt of the Belt Company to the Trust Company in the sum of $639,658.86 and interest from June 22, 1910, on $473,723.59 at the rate of 6 per cent. per annum, on $46,565.76 at the rate of 7 per cent. per annum, and on $119,369.51 at the rate of 8 per cent. per annum.

[4] The contention of the Southern Company that the Trust Company is estopped from enforcing and collecting this claim based on the unsecured debt of the Belt Company to it, because, for the bonds and stock of the Belt Company, which it owned, it received bonds and stock of the Southern Company under the plan of reorganization, is untenable. The collection of this claim is not an avoidance; it is an enforcement and execution of the scheme of reorganization and of the trust in favor of the creditors of the Belt Company, which that scheme created. The published plan of reorganization was plenary notice under the law to the Southern Company, and to all who became interested under that plan, that purchasers of property of the companies foreclosed pursuant to it took that property in trust for the unsecured creditors of those companies. That plan expressly set apart $475,000 to be applied to the payment of the floating debts of those companies, vested in the committee of reorganization discretionary power to pay such of those floating debts as it saw fit to discharge, and that it actually expended $1,164,172.56 in paying such debts. The committee had full authority to pay this claim of the Trust Company. The Trust Company may well have supposed that its claim, as well as the claims of other creditors of these foreclosed companies, which were paid to the amount of over a million dollars, would be paid by the committee. The Trust Company never represented that it would not, but persistently asserted that it would enforce its demand, and the collection of it from the Southern Company is neither barred by estoppel nor inconsistent with the previous position and action of the Trust Company.

Another objection to the enforcement of this claim is that the Trust Company was guilty of laches. There is nothing in the record to indicate that the Southern Company did not intend to pay the debts of the Belt Company until the foreclosure proceeding was brought by the Provident Company. As stated, the Trust Company interposed its claim in that action, and the decree provided that its rights respecting the enforcement of such claim should remain unaffected. When the Southern Company filed its petition of intervention in the case brought by the Cambria Company, the Trust Company promptly asserted in defense thereto the liability of the Southern Company. The Trust Company also brought an action in the state court against the Southern Company for a part of its claim, for the reasons which it had before asserted. The Southern Company filed its supplemental bill and

obtained an injunction against the prosecution of the action in the state court, which was reversed by this court. Guardian Trust Co. v. Kansas City Southern Ry. Co., 146 Fed. 337, 76 C. C. A. 615. The Trust Company then brought a second action in the state court for another portion of its claim. The Southern Company moved the state court to stay the actions, which motion was denied. It then filed another bill for an injunction against the Trust Company to prevent the prosecution of these actions, and the Circuit Court granted a preliminary injunction, which was reversed by this court. Guardian Trust Co. v. Kansas City Southern Ry. Co., 171 Fed. 43, 96 C. C. A. 285, 28 L. R. A. (N. S.) 620. Under these circumstances, the plea of laches is unfounded.

[5] Again, the issue of the liability of the Southern Company to the Trust Company for the debt of the Belt Company to it came into this case as an equitable defense to the intervening petition of the Southern Company of February 27, 1905, wherein it sought to appropriate to itself property of the Central Improvement Company, $^{1120}/_{1407}$ of the shares of the stock of which company had been pledged to the Trust Company by the Belt Company to secure $203,900 of the debt of the latter company to the former. The Southern Company endeavored to appropriate this property of the Central Company under the after-acquired clauses of the old foreclosed mortgages of the Belt Company, the Air Line Company, and the Gulf Company. The Trust Company answered: (1) That the Southern Company owed it this debt, that he who seeks equity must do equity, that the Southern Company was entitled to no relief until it paid this debt; and (2) that by virtue of the pledged stock of the Central Company to secure the payment of the debt of the Belt Company its equitable right to the property of that company was superior to that of the Southern Company. The Trust Company was guilty of no fatal laches here because it held the majority of the stock of the Central Company, and that company held the title to the property which the Southern Company sought to take, so that the Trust Company had a perfect legal right by virtue of its stock to appropriate the property to the payment of its debt and it needed no affirmative relief, and a court of chancery will, and it is its duty to, condition its grant of relief to a complainant with the enforcement of any just claim of the defendant which the latter ought in equity and good conscience to pay, although on account of the statute of limitations, or for some other reason, the defendant might not be able affirmatively to enforce it. Farmers' Loan & Trust Co. v. Denver, L. & G. R. Co., 126 Fed. 46, 51, 60 C. C. A. 588, 593; Pomeroy's Eq. Jur. §§ 386, 393, note 4; Brent v. Bank of Washington, 10 Pet. 596, 9 L. Ed. 547; De Walsh v. Braman, 160 Ill. 415, 43 N. E. 597, 600; Farmers' Bank v. Iglehart, 6 Gill (Md.) 50, 57; Fievel v. Zuber, 67 Tex. 279, 280, 3 S. W. 273; Booth v. Hoskins, 75 Cal. 271, 275, 276, 17 Pac. 225; De Cazara v. Orena, 80 Cal. 132, 134, 22 Pac. 74; Hall v. Arnott, 80 Cal. 348, 354, 22 Pac. 200; Grant v. Burr, 54 Cal. 298, 301; McKeen v. James (Tex. Civ. App.) 23 S. W. 460, 464; Rodriguez v. Haynes, 76 Tex. 225, 232, 13 S. W. 296; Hartranft's Estate, 153 Pa. 530, 533, 26 Atl. 104, 34 Am. St. Rep. 717; 19 Am. & Eng. Enc. of Law (2d Ed.) pp. 177, 178; Dimick v. Grand Island Banking Co., 37

Neb. 394, 399, 55 N. W. 1066; Gage v. Riverside Trust Co. (C. C.) 86 Fed. 984, 998; Whitmore v. Savings Union, 50 Cal. 145, 150; Spect v. Spect, 88 Cal. 437, 444, 26 Pac. 203, 13 L. R. A. 137, 22 Am. St. Rep. 314.

[6] It is insisted upon the part of the Southern Company that the reference to a master was by consent of parties, and hence that the findings of the master are not subject to review. We do not think the record supports the statement that the master was appointend by consent of parties. As before stated, the Cambria Company filed its bill September 6, 1900, and the record shows that, on the 7th of November, defendant having answered, the case was referred by the court upon its own motion to Shannon C. Douglass. On February 27, 1905, a stipulation was filed by the parties to the effect that the Southern Railway Company might become a party to the action either by joint complaint or by bill of intervention, as it might elect, and file its bill, asserting its claim, on or before February 25, 1905; that the adverse party should have 10 days thereafter in which to plead, and the testimony theretofore taken should be applicable as evidence in support of and in resistance of the Southern Company's claim; "that such orders of court as may be necessary for the purpose may be entered carrying into effect this stipulation." In accordance with this stipulation, the court made an order, permitting the Southern Company to file its bill of intervention, and gave the adverse party 10 days in which to plead the same, referring the issues to Shannon C. Douglass to take the testimony thereon and report, etc. This stipulation was not a stipulation consenting to the appointment of a master, but was simply one which authorized the court to make the necessary orders relative to permitting the Southern Company to intervene, and fixing the time within which the parties should plead thereto and an order that the testimony theretofore taken should be treated and considered as testimony relative to the issues made by the Southern Company's bill of intervention. The reference to the master was by the court upon its own motion. The court would naturally refer that issue to the master who had theretofore been appointed by the court on its own motion to hear the case. Subsequently, on the 1st of May, 1905, the parties stipulated that the Southern Company might amend its intervening petition, setting up, in addition to the matters contained in its intervening petition on file, a claim against the Trust Company for an alleged breach of trust, and consented in the stipulation that such new issue should be referred to Shannon C. Douglass, the special master, and the court, pursuant to the stipulation, made an order permitting the Southern Company to file its amended intervening petition in that respect, and referred it to Shannon C. Douglass. It is this last stipulation and this order of the court upon which the Southern Company bases its argument that the reference of the case to the master was by consent of parties. As before stated, the main issues, and the issues involved on this appeal, had been referred to the master by the court upon its own motion. The stipulation that the new issue made by the amended intervening petition should be referred to the master was a stipulation with reference to that issue, that issue was decided by the master in favor of the Trust Company, and is not before

us for review. So the case is not one where the issues involved have been heard by a master appointed by consent of the parties. Even though the original appointment of the master had been by consent of parties, a reference under those circumstances would not preclude the court from correcting manifest errors of law made by the master. Rule 11 of this court; United States v. Tennessee & C. R. R. Co., 176 U. S. 242–256, 20 Sup. Ct. 370, 44 L. Ed. 452; Clyatt v. United States, 197 U. S. 207, 222, 25 Sup. Ct. 429, 49 L. Ed. 726; United States v. Bernays, 158 Fed. 792, 86 C. C. A. 52; New York Life Ins. Co. v. Rankin, 162 Fed. 103, 108, 89 C. C. A. 103.

The Central Improvement Company has made application to dismiss its appeal. It is not very material to the disposition of this case and to the adjudication of all the rights of the parties to this suit whether the application is granted or denied because the Trust Company had such an equitable interest in the property of the Central Company by virtue of the pledge to it of 1,120 out of the 1,407 shares of the stock of that company issued that the Trust Company's appeal completely challenges the decree of the court with reference to that property and furnishes ample warrant for its review and reversal. The Central Company has no property of substantial value except that specified in the decree. It is a mere holding company either for the Trust Company or for the Southern Company, and the determination of their respective equities necessarily determines the rights of the Central Company and the ownership of the beneficial interest in its property, and the motion to dismiss its appeal is denied.

The result is that the Southern Company is entitled to no relief in this suit unless it first pays to the Trust Company the amount of the Belt Company's debt to it and the costs of this suit, because it became indebted to the Trust Company in the amount of that debt by its acquisition of the property of the Belt Company under the reorganization scheme with full knowledge that the stockholders of the Belt Company thereby preserved for themselves an interest in that property to the exclusion of the Trust Company, a creditor of that corporation.

[8] Moreover, if the Southern Company were not equitably estopped from recovering the property of the Central Company by its indebtedness to the Trust Company, nevertheless, equity would require it to pay to that company the value of the latter's 1,120 pledged shares of the stock of the Central Company before it would permit it to take the property of the latter company and thus to destroy the value of its stock through its claim as a purchaser at foreclosure sales under the after-acquired clauses of the old mortgages of the Gulf Company, the Air Line Company, and the Belt Company. The property in controversy is the remnant of numerous pieces of real estate to which the Central Company took title and for the purchase prices of which it issued its stock at par to the Gulf Company, the Belt Company, and the Air Line Company, respectively, which companies paid the par value of that stock either to it or to the vendors from whom the property was bought. The result was that the Central Company, a corporation, owned and held the property in trust to pay the stockholders the par value of its stock which was the purchase price of the property.

In this state of the case the Belt Company, which acquired 1,120 of the 1,407 shares of the stock thus issued by the Central Company, pledged this stock in the year 1899 to the Trust Company to secure the payment of $203,900 of its debt to that company, and the title and rights of the parties stood thus unquestioned from 1899 until 1905, when the Southern Company filed its intervening petition in this case. It asserted that the Central Company held this property in trust for the mortgagor companies and that the after-acquired clauses of their mortgages carried it to itself, the purchaser at the foreclosure sales thereunder. Conceding that the property was appurtenant to the railroad and that the terms of the after-acquired clauses were broad enough to include it, how can this claim of the Southern Company be sustained? The after-acquired clause of a mortgage attaches to the interest acquired by the mortgagor only, and it is always subject and inferior to junior liens, incumbrances, and equities under which the property comes to the mortgagor. Farmers' Loan & Trust Co. v. Denver, L. & G. R. Co., 126 Fed. 46, 49, 60 C. C. A. 588, 591; United States v. New Orleans R. R. Co., 12 Wall. 362, 20 L. Ed. 434; Central Trust Co. v. Kneeland, 138 U. S. 414, 423, 11 Sup. Ct. 357, 34 L. Ed. 1014. In a simple case the justice and the application of this rule is plain. A railroad company makes a mortgage of its property with an after-acquired clause. It subsequently purchases a piece of property and gives its note and mortgage for the purchase price, and the vendor sells or pledges the note to a third person to secure his debt. The mortgagee of the railroad may not deprive the pledgee of the note of the property which secures it under' the after-acquired clause of his mortgage until he pays the junior note and mortgage, and this because he has given nothing for this property while the junior mortgagee and his pledgee have parted with value for their security upon it. In the case in hand, the Central Company acquired the property here in dispute for its liability to pay to its stockholders the par value of its stock, and it held the property in trust to secure the payment to its stockholders of that liability. The mortgagees under the railroad mortgages and the Southern Company, the purchaser thereunder, knew these facts. They parted with no value on account of this property, and a court of conscience may not permit them to deprive the stockholders of the Central Company, who have really paid for it, of the trust property which the Central Company holds to reimburse them unless the court first requires them to pay to the holders of the stock its actual value.

The fact that the mortgagor companies originally took and held the stock of the Central Company before the Belt Company pledged it to the Trust Company has not been overlooked. That fact, however, only clearly fixes the legal rights and equities of the parties, fixes the title to the land in the Central Company, and estops the mortgagor companies and all claiming under them from denying that the stock which they took and sold or pledged constituted the primary liability of the Central Company and the primary equity in the property it holds as against the mortgagees of the railroad companies and the

purchaser thereunder. Watson v. Bonfils, 116 Fed. 157, 163, 166, 167, 53 C. C. A. 535, 541, 544, 545.

The stock of the Central Company was not the property of that company. It was a liability of that company. Conceding that the after-acquired clauses of the mortgages conveyed the Central Company's interest in this land subject to its primary trust to pay this liability, they did not convey its liability, or the stock which represented it. Humphreys v. McKissock, 140 U. S. 304, 314, 11 Sup. Ct. 779, 35 L. Ed. 473. The equity of the stockholders as against the Southern Company, which took whatever it has with full notice of all the facts in this case, is the same that it would have been if the liability of the Central Company, now represented by its stock for the purchase price of the property, had been represented by its promissory notes and a mortgage upon this land to secure them and they had been pledged by their owners to secure their debt to the Trust Company. The Trust Company, which holds 1,120 shares of the stock of the Central Company to secure a debt to it of more than $200,000, has an equitable interest in the land of the Central Company superior to that of the Southern Company, and the latter is entitled to no relief with reference to this property until it pays to the Trust Company the value of that stock.

The controlling equities of this case require that the decree below should be so modified, among other things, that it will adjudge that the Southern Company is indebted to the Trust Company in the amount which the Belt Company owes it, that is to say, in the sum of $639,-658.86 and interest thereon from the date of the original decree, and that no relief be granted to the Southern Company unless that debt is paid.

Three of the stockholders of the Trust Company, at whose instance the question of the liability of the Southern Company was pressed to a decision in this court by the Trust Company, and its counsel, have filed a petition for leave to present the suggestion that, in case this court finds, as it has found, that the Southern Company owes this debt, a decree should be rendered against it in this suit to the effect that the Trust Company recover this amount from the Southern Company and have execution therefor. There is no prayer for this specific relief in any of the pleadings of the Trust Company, but it is relief to which, under the law and upon the facts now found, the Trust Company is clearly entitled from this, or some other court, and in its answer to one of the numerous bills filed in this case it prayed for such other and further relief as should seem meet and just in the premises. The facts that the Southern Company voluntarily intervened in this suit in 1905 and sought to take from the Trust Company the security for its claim furnished by the stock of the Central Company and by a large amount of other stocks, bonds, and property, to which the Southern Company was not entitled, that this attempt of the Southern Company called into this suit the Trust Company's claim that the Southern Company owed it the amount of the debt of the Belt Company, that the Trust Company tendered that issue in actions at law which it brought as long ago as 1905 and 1906, against the Southern

Company in a state court to recover from it this very indebtedness, that the Southern Company delayed and prevented the trial of that issue in those actions at law by means of two successive injunctions which it obtained from the court below, on the ground that this issue was pending in this suit, injunctions which on appeal this court promptly dissolved (Guardian Trust Co. v. Kansas City Southern Ry. Co., 146 Fed. 337, 76 C. C. A. 615; Guardian Trust Co. v. Kansas City Southern Ry. Co., 171 Fed. 43, 96 C. C. A. 285, 28 L. R. A. [N. S.] 620), that this suit has been thoroughly litigated by all parties interested in it for more than six years, that tens of thousands of pages of evidence have been taken in this litigation, and that further litigation in the state court over this issue, although it becomes res adjudicata by this decision, may by appeal or otherwise result in further delay, cause this suggestion of these stockholders to challenge serious consideration. It seems that if by the amendment of any of the pleadings of the Trust Company, or by the filing by it of a cross-bill, or a supplemental bill, or without them, such a decree as suggested may be lawfully rendered, justice and equity would require that that course should be pursued. The three stockholders are accordingly permitted to file their suggestion, and leave is granted to the Trust Company, the Southern Company, and to any other party to this suit, to make such motions and present such arguments and authorities, either orally or in writing, to this court at St. Louis on January 10, 1913, regarding this suggestion, as to them shall seem meet. The issue presented by this suggestion is reserved for later consideration.

But whatever may be the result of that consideration, the decree below must be reversed, and this case must be remanded to the court below, with instructions to render a decree which shall contain the first five paragraphs of the decree below, shall adjudge that the equitable claim of the Trust Company, by virtue of the pledge to it of 1,120 shares of the stock of the Central Company, in the property of that company described in the sixth paragraph of that decree, is superior to the claim and equity of the Southern Company therein, that the Southern Company is indebted to the Trust Company in the amount of the indebtedness of the Belt Company to that company—that is to say, in the sum of $639,658.86 and interest from the date of the original decree below, on $473,723.59 at 6 per cent. per annum, on $46,565.76 at 7 per cent. per annum, and on $119,369.51 at 8 per cent. per annum—that the Southern Company must pay this debt as a condition of obtaining any relief in this suit, that the ninth, tenth, eleventh, and thirteenth paragraphs of the original decree be again adjudged, and that the Trust Company recover its entire costs of the Southern Company and the Cambria Company, and that the share of such costs as between themselves, but not as against the Trust Company, that shall be paid by the Cambria Company and the Southern Company, shall be determined by the court below as to it may seem just and equitable.