## UNITED STATES *v.* TENNESSEE AND COOSA RAIL-ROAD COMPANY.

APPEAL FROM THE CIRCUIT COURT OF APPEALS FOR THE FIFTH CIRCUIT.

No. 53. Argued December 12, 13, 1899. — Decided February 5, 1900.

The grant of public land made to the State of Alabama by the act of June 3, 1856, c. 41, to aid in the construction of railroads, to be subject to the disposal of the legislature for the purposes named in the act and no other, with a provision that if any of said roads were not completed within ten years the lands remaining unsold should revert to the United States, was a grant *in præsenti;* the condition so expressed was a condition subsequent; and the rights and powers of the State continued until the grant should be directly forfeited by judicial or legislative proceedings.

The provision in the act of September 29, 1890, c. 1040, that "there is hereby forfeited to the United States, and the United States hereby resumes the title thereto, all lands heretofore granted to any State or to any corporation, to aid in the construction of a railroad opposite to and coterminous with the portion of any such railroad not now completed and in operation, for the construction and benefit of which such lands were granted, and all such lands are declared to be a part of the public domain," did not operate upon lands opposite completed roads, and such lands were not thereby forfeited or resumed.

The allegation that the sale to Carlisle was without consideration and colorable was not sustained by the evidence.

Although the bill was framed to secure a forfeiture of the entire grant, that does not preclude a forfeiture for a part of it.

THIS suit was brought under the act of September 29, 1890, c. 1040, 26 Stat. 496, to forfeit a land grant made to the State of Alabama in aid of the construction of a railroad from the Tennessee River at or near Gunter's Landing to Gadsden, on the Coosa River, conveyed by the State to the Tennessee and Coosa Railroad Company.

The bill alleges that Congress by the act of June 3, 1856, c. 41, 11 Stat. 17, granted to the State of Alabama in trust for certain railroads, of which the respondent, the Coosa Railroad, was one, every alternate odd-numbered section for six sections in width on each side of the road, with the right of selection

of others if rights had attached to such alternate sections, within fifteen miles of the line of the road, as follows :

"That a quantity of land not exceeding one hundred and twenty sections, for each of the roads named in said act, and included within a continuous length of twenty miles of each of said roads named therein, may be sold, and when the Governor of Alabama should certify to the Secretary of the Interior that any twenty continuous miles of any of said roads were completed, then another quantity thereby granted, not to exceed one hundred and twenty sections for each of said roads having twenty continuous miles completed as aforesaid, and included within a continuous length of twenty miles of each of said roads, may be sold — and so from time to time until said roads were completed, and if any of said roads were not completed within ten years, no further sales should be made, and the lands unsold should revert to the United States."

That the State accepted the grant by an act of its legislature approved January 20, 1858, upon the terms and conditions expressed in the act of Congress, and granted a portion of the lands to the Coosa Railroad.

That the railroad constructed ten and 22–100 miles of road along the line of definite location of survey, to wit, from Gadsden northward toward Gunter's Landing, but did not construct any portion thereof prior to June 3, 1866, and never constructed or completed twenty miles of railroad prior to September 29, 1890.

That by virtue of the act of Congress all the lands unsold at the expiration of ten years from its date reverted to the United States, and that the railroad company did not sell any lands prior to June 3, 1866, and never became entitled to any of the land or to the possession thereof, but that the railroad company selected the lands described in the bill within the six-mile limit and those within the fifteen-mile limit, which selections were approved by the Secretary of the Interior. Exhibits were attached to the bill giving detail descriptions.

That the selections and approval were made upon the filing of a map of definite location and not upon the certificate of the Governor of the State showing that twenty continuous miles

of road had been constructed, for no section of twenty miles had been constructed before the passage of the act of Congress of September 29, 1890.

That the United States became entitled to the possession of the lands on the 4th of June, 1866, and the right to recover both the title to and the possession of them.

That by the act of September 29, 1890, the United States resumed the title to all the lands which were opposite to and coterminous with any portion of such railroad not completed and in operation at the date of the passage of the act; and that none of the lands described in paragraph 1 and Exhibit "A" were opposite to and coterminous with road constructed and completed at that date.

That the railroad company on the 4th of April, 1887, executed and delivered to Hugh Carlisle an instrument purporting to be a quitclaim deed, by which the company pretended to convey to him seventeen thousand and ten $\frac{33}{100}$ acres of the land granted to it for the consideration of $21,790; and on the 7th of February, 1887, executed another instrument to Carlisle, by which it attempted to convey to him 23,739$\frac{51}{100}$ acres, and which recited a payment of $59,348.70.

That said instruments were executed more than twenty years after the expiration of the time required for the construction of the railroad; that the company had no right or power to convey any title or right; that its officers and Carlisle knew the fact, and for the purpose of preventing the reversion of the lands to the United States the company executed and Carlisle accepted the conveyances. That while they recite a valuable consideration paid by him, no money or valuable thing was paid, but that the whole transaction was merely a device to mislead and deceive for the purpose of enabling Carlisle to set up a claim that he held the lands as a purchaser for value and in good faith from the railroad company. That he is a purchaser *mala fide*, well knowing that the purchase was in violation of the act of 1856; that he holds them under a secret trust for said company and its stockholders, and that he and his relatives are the largest stockholders, and elected themselves, and others subject to

their control, directors, and by directors so composed the conveyances to him were executed.

That there is valuable timber on the lands which the company and other persons are cutting and carrying away, and valuable mines which they are working, and that the company is collecting the purchase money for lands sold by them, and is alienating other lands, and it is therefore necessary to have a receiver appointed.

A number of persons beside Carlisle are made defendants on the ground that they are in possession of some of the lands, and the Nashville &c. Railway Company and the Manhattan Trust Company are also made defendants on the ground that they claim an interest in a large part of the lands under contract with the Tennessee and Coosa Railroad Company, which it is averred were taken with knowledge of the rights of the United States.

The prayer is for a receiver and an injunction and cancellation of the selections made by the company, the conveyances and contracts made by it, and for general relief.

The Exhibits A and B contain a list of lands respectively within the six- and fifteen-mile limit, and Exhibits D and E are the conveyances to Carlisle.

A receiver was appointed upon the bill without notice, and an injunction *pendente lite* issued. The injunction was subsequently modified to exclude from its operation certain of the lands.

Carlisle filed a demurrer and answer to the bill. The answer admitted all the allegations of the bill material to the propositions presented on this appeal except those charging deception and fraud in the conveyances to him, but specifically alleged that they were executed in good faith and for valuable consideration, and that the lands included in the deed from the company to him (Exhibit "D" of original bill) are all opposite to and coterminous with the ten and 22–100 miles of completed road. By an amendment to the answer it was alleged that said lands were within six miles of the line of definite location of the road and within the primary granted limits.

It was further alleged that he contracted with the railroad company in 1859 to build the road; that in 1860 the company executed a mortgage upon its franchises and other property, especially upon the lands granted by Congress, to secure 400 bonds, each of the value of $1000, issued by the company, and eleven of them were pledged with him to secure the amount due him for work done prior to 1861, and that at the time the civil war broke out he had 400 hands working on the road, and was progressing rapidly with the building of the same. That during the war and after the war his and the company's financial condition prevented further construction. In 1871 the company made a conditional sale of the road to the East Alabama and Cincinnati Railroad Company to complete the road, but that company only built five miles of it between Gadsden and Attalla; that in 1883 the Coosa company resumed possession, and passed a series of resolutions approving and ratifying what he had done, constituting him its financial agent with power to construct, equip and put in running order the road from Attalla to Guntersville, and empowered him to use all the assets of the company; and agreed to pay him out of the assets the original cost and expenses that he should incur in the construction, equipment and putting the road in running order, together with twenty per cent in addition for superintendence and advances made by him; and that he retain a lien on the railroad and its franchises, both real and personal, until the costs and expenses incurred by him be fully paid off, together with said twenty per cent in addition. The said resolutions also revived and renewed the indebtedness due to him for work done prior to 1860.

That he put forth every energy to build the road, and expended in the work under a contract with the company large sums of his private resources; that the company had no money and no other resources except said lands, and no means except as supplied by him.

That in 1886 the road was completed as far as Littleton, a distance of ten and 22–100 miles; that during all this time the money due him for work done prior to 1861 had not been paid, and that sum, amounting to $47,000, and the money

expended afterwards by him, amounted to $85,750.92, and that his account was submitted to the board of directors of the company and was credited and approved.

That in February, 1887, the directors, desiring to pay him, and having no assets, offered to convey the lands described in Exhibit " E " to the bill in payment *pro tanto* of his account at two dollars and a half per acre; that he finally agreed to accept twenty-three thousand seven hundred and thirty-nine and 57-100 acres at said price, and the company conveyed the same to him absolutely, without any trust or reservation whatever, and that after receiving such conveyance there still remained due him $26,401.27.

That on the 2d of April, 1888, the company conveyed to him about 16,400 acres of land, described in Exhibit " D," attached to the original bill, at the price of one dollar and twenty-five cents per acre, which was the full value of the interest of the company in the lands, because they lay within the conflicting limits of the grants to the company and the Alabama and Chattanooga Railroad Company, and the Coosa company only owned an undivided moiety; that the consideration was money due the respondent as aforesaid, and the conveyance was absolute and without any trust or reservation.

That all the lands described in Exhibit " E " are a part of the first one hundred and twenty sections of the grant, and are opposite to and coterminous with the first twenty miles of the railroad as shown by the map of the definite location, which was duly filed in accordance with the act of Congress, and are included in the lands which the company was authorized to sell in advance of the construction of any portion of the road. And it was alleged in an amendment to the answer that the company sold lands within the first one hundred and twenty sections at divers times to divers persons for two and 50-100 dollars per acre, usually on credit and notes taken and placed in his, Carlisle's, hands as collateral security for the money due him, and most of the notes still remain in his hands, and only a small amount has been paid thereon; that the vendees of the company are in possession, and that he

during the years 1887 and 1888 sold for a valuable consideration the lands described in Exhibit "E" of the original bill to purchasers in good faith, who paid for the same and received his warranty deed. A list of the purchasers is attached to the answer.

The answer of the railroad company was substantially the same as that of Carlisle, and the answers of the other respondents allege their respective relations to the lands, but are not otherwise material to the propositions in controversy.

Upon the testimony submitted, oral and documentary, the Circuit Court found as follows:

"First. That prior to the 29th day of September, 1890, the Tennessee and Coosa Railroad Company had sold to *bona fide* purchasers all the lands embraced in the first 120 sections, which by the terms of the granting act it was authorized to sell in advance of the construction of the road. That these sales were *bona fide* and made to aid in the construction of the road. That the allegations of the bill, that the sale to Carlisle was without consideration and colorable, are not sustained by the evidence, but the sale to Carlisle was *bona fide* and based on good consideration, and the proceeds of the sale used in the construction and equipment of the road.

"Second. The court finds that the Tennessee and Coosa Railroad from Gadsden to Littleton, a distance of ten and 22–100 miles, was completed and in operation on and before the 29th day of September, 1890, and that the lands described in Exhibit D to the original bill, to wit, the lands embraced in and conveyed by the deed from the Tennessee and Coosa Railroad Company to Hugh Carlisle, bearing date the 4th day of April, 1887, are lands which lie opposite to that part of the road which was completed and in operation on the 29th day of September, 1890, and therefore not within the lands forfeited by the act of September 29, 1890.

"The court is therefore of the opinion that there has been no forfeiture of the lands as to which a judicial declaration of forfeiture is sought by the bill, and it is accordingly ordered and decreed that the relief sought by the bill be denied and the bill dismissed."

In the opinion of the court it 'was said, "that the lands embraced in the first one hundred and twenty sections of the granting act, the railroad company was authorized to sell in advance of the construction of the road, and that the parties to whom such sales were made, took good title, and there can be no recovery or restitution of any of these lands to the public domain in this case.  2. That the lands described in Exhibit D to original bill are lands which lie opposite to that part of the road which was completed and in operation on the 29th day of September, 1890, and are not within the lands covered by the act of September 29, 1890."  81 Fed. Rep. 544.

The decree of the Circuit Court was affirmed by the Circuit Court of Appeals, 52 U. S. App. 171, and the United States took this appeal.

*Mr. Charles W. Russell* for appellants.  *Mr. Solicitor General* was on his brief.

*Mr. Amos E. Goodhue* for appellees.

Mr. Justice McKenna delivered the opinion of the court.

The questions which primarily arise on this appeal are based on the provisions of the granting act of 1856 and the forfeiting act of 1890.

The United States contend that the provisions of the former caused a reversion of the title in 1866; the contention of appellees is that some affirmative action, legislative or judicial, on the part of the grantor, was necessary for the forfeiture of the grant, and that until such action the title and all the powers conferred by the act of 1856 continued and could be exercised. And further, that the act of 1890 was the measure of forfeiture.

By the act of 1856 it is enacted —

"That there be and is hereby granted to the State of Alabama, for the purpose of aiding in the construction of railroads; from the Tennessee River, at or near Gunter's Landing, to Gadsden, on the Coosa River, . . . every alternate section of land designated by odd numbers for six sections in width on each side of each of said roads."

"SEC. 3. That the lands hereby granted to the said State shall be subject to the disposal of the legislature thereof for the purposes aforesaid and no other. . . .

"SEC. 4. That the lands hereby granted to said State shall be disposed of by said State only in manner following, that is to say: That a quantity of land, not exceeding one hundred and twenty sections for each of said roads, and included within a continuous length of twenty miles of each of said roads, may be sold; and when the governor of said State shall certify to the Secretary of the Interior that any twenty continuous miles of any of said roads is completed, then another quantity of land hereby granted, not to exceed one hundred and twenty sections for each of said roads having twenty continuous miles completed as aforesaid, and included within a continuous length of twenty miles of each such roads, may be sold; and so, from time to time, until said roads are completed; and if any of said roads is not completed within ten years, no further sale shall be made, and the lands unsold shall revert to the United States."

The material part of the act of 1890 is as follows:

"*Be it enacted,* That there is hereby forfeited to the United States, and the United States hereby resumes the title thereto, all lands heretofore granted to any State or to any corporation to aid in the construction of a railroad opposite to and coterminous with the portion of any such railroad not now completed and in operation for the construction and benefit of which such lands were granted, and all such lands are declared to be a part of the public domain."

These principles are established: That acts like that of 1856 convey a present title, that the conditions expressed in them are subsequent, not precedent, and the rights and powers of the grantee continue until the grant is directly forfeited by legislative or judicial proceedings. If the cases were less certain, less directly applicable to the case at bar, we might attend in detail to the able argument of the counsel for the United States.

In *Schulenberg* v. *Harriman,* 21 Wall. 44, the leading case, the road in aid of which the grant was made was not con-

structed, the ten years' limitation upon the sale of the land had expired, and of the provision that the lands should revert to the United States it was said that it was "no more than a provision that the grant shall be void if a condition subsequent be not performed." Sheppard's Touchstone was cited and applied as follows:

"In Sheppard's Touchstone it is said: 'If the words in the close or conclusion of a condition be thus, that the land shall return to the enfeoffor, etc., or that he shall take it again and turn it to his own profit, or *that the land shall revert*, or that the feoffor shall *recipere* the land, these are, either of them, good words in a condition to give a reëntry — as good as the word "reënter" — and by these words the estate will be made conditional.' The prohibition against further sales, if the road be not completed within the period prescribed, adds nothing to the force of the provision. A cessation of sales in that event is implied in the condition that the lands shall then revert; if the condition be not enforced the power to sell continues as before its breach, limited only by the objects of the grant, and the manner of sale prescribed in the act.

\*          \*          \*          \*          \*

"In what manner the reserved right of the grantor for breach of the condition must be asserted so as to restore the estate depends upon the character of the grant. If it be a private grant, that right must be asserted by entry or its equivalent. If the grant be a public one it must be asserted by judicial proceedings authorized by law, the equivalent of an inquest of office at common law, finding the fact of forfeiture and adjudging the restoration of the estate on that ground, or there must be some legislative assertion of ownership of the property for breach of the condition, such as an act directing the possession and appropriation of the property, or that it be offered for sale or settlement. At common law the sovereign could not make an entry in person, and, therefore, an office found was necessary to determine the estate, but, as said by this court in a late case, 'the mode of asserting or of resuming the forfeited grant is subject to the legislative authority of the government. It may be after judicial investi-

gation, or by taking possession directly under the authority of the government without these preliminary proceedings.' In the present case no action has been taken either by legislation or judicial proceedings to enforce a forfeiture of the estate granted by the acts of 1856 and 1864. The title remains, therefore, in the State as completely as it existed on the day when the title by location of the route of the railroad acquired precision and became attached to the adjoining alternate sections."

The power of sale of one hundred and twenty sections in advance of the commencement of the construction of the road was impliedly decided. That power, however, came more explicitly into consideration in *Railroad Land Co.* v. *Courtright*, 21 Wall. 310, where again a similar granting act was passed on. The court reaffirmed the principles expressed in *Schulenberg* v. *Harriman*, and said again by Mr. Justice Field:

"It is contended by the defendants, *first*, that under the act of Congress of May 15, 1856, no lands could be sold by the State until twenty continuous miles of the road were constructed; *second*, that if one hundred and twenty sections could be sold in advance of such construction, they could only be taken from lands adjoining the line of the road from its commencement on the east; and, *third*, that the grant by the State to the first company was upon conditions precedent, which not having been complied with, the title did not pass. Neither of these positions can, in our judgment, be maintained. The act of Congress by its express language authorized a sale of one hundred and twenty sections in advance of the construction of any part of the road. It was only as to the sale of the remaining sections that the provision requiring a previous completion of twenty miles applied. It is true it was the sole object of the grant to aid in the construction of the railroad, and for that purpose the sale of the land was only allowed, as the road was completed in divisions, except as to one hundred and twenty sections.

" The evident intention of Congress in making this exception was to furnish aid for such preliminary work as would be required before the construction of any part of the road. No conditions, therefore, of any kind were imposed upon the State

in the disposition of this quantity, Congress relying upon the good faith of the State to see that its proceeds were applied for the purposes contemplated by the act."

Counsel for the United States attempts to distinguish the *Courtright* case from the case at bar, and asserts that in *Schulenberg* v. *Harriman* the power of the State to sell, subject or not subject to the grantor's rights after the expiration of ten years, although the road had not been finished, was not at issue; and any expressions on that topic were mere dicta. We do not assent to this view. Such power was a necessary consequence of the principles announced, and they have a more extensive authority and application than to the instance in that case.

The title passed to the State, it was decided, continued in the State with all its attributes and power, except as expressly limited, until it should be resumed by the grantor by appropriate proceedings for breach of conditions. Hence the logs in that case, though cut upon land to aid a railroad which had not been constructed, and after the time designated for its construction, and after which all unsold lands should revert to the State, was held to belong to the State. And in the *Courtright* case upon the same principles it was held that lands sold by the railroad without constructing the road carried title to the vendee. There was a reassertion and an application of the same principles in *United States* v. *Loughrey*, 172 U. S. 206.

It follows that by the act of June 3, 1856, the State of Alabama took the title to the lands in controversy upon conditions subsequent, and conveyed such title upon the same conditions to the Coosa Railroad; and that it continued in the railroad until determined by proceedings, legislative or judicial, for such forfeiture, and until such determination all the rights and powers conferred by the act continued and could be exercised.

Those rights and powers were (1) to sell 120 sections of land in advance of the construction of any part of the road; (2) to sell a like quantity upon the completion of any twenty miles of road.

The first power, it is claimed, was exercised by sales to *bona fide* purchasers. The condition of the second power was not performed — twenty continuous miles of road were not completed at the time of the passage of the act of 1890. But it is not denied that ten and 22–100 miles were completed before the passage of that act.

1. The Circuit Court found that the first power was exercised as claimed. In other words, that the lands embraced in the first one hundred and twenty sections were sold to *bona fide* purchasers in aid of the construction of the road, and "that the allegations of the bill, that the sale to Carlisle was without consideration and colorable, was not sustained by the evidence, but the sale to Carlisle was *bona fide* and was based on good consideration, and that the proceeds of the sale were used in the construction and equipment of the road." We think that the findings are sustained by the evidence.

2. By the act of 1890 the United States forfeits and "resumes the title thereto all lands heretofore granted to any State or to any corporation to aid in the construction of a railroad opposite to and coterminous with the portion of any such railroad not now completed and in operation for the construction or benefit of which such lands were granted, and all such lands are declared to be a part of the public domain."

The necessary implication of these provisions seems to be that lands opposite completed road are not forfeited or resumed. But the counsel for the United States contests or seems to contest the implication. He says: "The general forfeiture act of September, 1890, intends to forfeit lands opposite unconstructed portions of road. It intends to forfeit them *for that reason*. It intends by no means to say that no lands are to be otherwise and for other reasons forfeited; that all conditions precedent in all cases of land grants are waived. It purports to waive nothing, but to forfeit for a cause common to all the old grants of lands for railroads — failure to construct prior, to September, 1890." And again: "That act of 1890 was intended to take away lands and not to grant them, and it is too well settled to need discussion that lands and rights of the public cannot be granted away except in

the most *explicit, affirmative* terms." This, perhaps, is but another form of the contention which we have considered and refuted, but we may further say that its error is in assuming that the act of 1890 is claimed to be a grant. The act of 1856 was the grant. The title it conveyed continued until resumed, and as to what lands it was resumed the act of 1890 defines.

These considerations dispose of the contentions as to the 120 sections and the lands opposite completed road, but it is assigned as error that the Court of Appeals omitted to direct "a decree in favor of the United States as to lands not within either the said 120 sections or the 17,410.33 acres [lands opposite completed road], whether sold or not." And it is said: "The road being thirty-six miles and a fraction long, and the 120 sections absolutely required to be along twenty consecutive miles, and being in fact, as certified before the war of 1861, at and near the Guntersville end, sixteen miles and a fraction of road, at least, remain to be considered. Ten miles, beginning at the Gadsden end, were constructed before the act of 1890, leaving at least six miles; so that, obviously, the easy method resorted to by the lower courts of dividing all the lands into 120-section lands and lands opposite constructed road ignores our rights along six miles, to say nothing of the large body of lands along the twenty miles referred to but *not* in the 120 sections of place and indemnity certified before the war, and opposite *uncompleted* road in 1890."

This, it is replied, is contradicted by the findings of the Circuit Court, and that the record affords no evidence to dispute the findings. The findings were, as we have seen, that the lands embraced in the first one hundred and twenty sections were sold to *bona fide* purchasers; that Carlisle was such; that the road from Gadsden to Littleton, a distance of 10.22 miles, was completed and in operation on or before the 29th of September, 1890, and that the lands conveyed to Carlisle by deed dated April 4, 1887, were opposite to that part of the road. The conclusion was that "there has been no forfeiture of the lands as to which a judicial declaration of forfeiture is sought by the bill, and it is accordingly ordered

and decreed that the relief sought by the bill be denied and the bill dismissed."

Manifestly this decision is dependent upon the identity of the lands described in the bill with those embraced in the first one hundred and twenty sections and those opposite the ten miles of completed road. But this does not seem to be the fact. The bill gives a description of the lands by townships, ranges and sections, and at the argument a map was used showing them, their relation to the railroad, and its location and termini. It also showed the end of the first one hundred and twenty sections. Assuming the map to be correct, (and it is not questioned,) some judgment may be formed of the length and location of the road, the relative situation of the lands described in the bill to the road — to its completed and uncompleted part; and it appears that there are a number of acres of land south of the first one hundred and twenty sections, and between them and Littleton, (a distance of six miles,) of which a forfeiture should have been declared. In other words, it appears from the evidence and admissions that the road is thirty-six miles long, that the first one hundred and twenty sections were selected along a continuous length of twenty miles of the road from Gunter's Landing southward, and that the part of the road which was completed at the date of the forfeiting act was from Gadsden northward ten and $\frac{22}{100}$ miles, and terminated at Littleton. It is evident, therefore, that lands opposite the road from Littleton, northward six miles, are not embraced in the first one hundred and twenty sections and were not opposite completed road September 29, 1890, and hence were forfeited by the act of Congress of that date, (*supra*,) and if included in the description of the bill should be declared forfeited.

It is urged, however, by appellees that the decree should not be reversed, because the bill was framed to procure a forfeiture of the grant, not to adjust its limits, and because the question was not raised by the assignment of errors on the appeal to the Circuit Court nor on this appeal. Neither reason is sufficient. We may notice a plain error, though not assigned, and the prayer in the bill for a for-

feiture of the entire grant did not preclude a forfeiture of a part of it.

We think, therefore, a further investigation on the particular point indicated is required by the Circuit Court, and return the case for such investigation.

*The decree of the Circuit Court of Appeals is reversed, and the case remanded to the Circuit Court with directions to proceed in accordance with this opinion.*