### PHILLIPS PETROLEUM CO. v. JOHNSON.

#### No. 11308.

Circuit Court of Appeals, Fifth Circuit. Feb. 1, 1946.

Rehearing Denied March 22, 1946.

Second Motions for Rehearing Denied May 17, 1946.

---

* Ayers v. United States, 8 Cir., 58 F.2d 607, 609.

Warren M. Sparks and E. H. Foster, both of Amarillo, Tex., Rayburn L. Foster, of Bartlesville, Okl., and C. B. Cochran, of Oklahoma City, Okl., for appellant.

D. H. Culton, of Amarillo, Tex., for appellee.

Before SIBLEY, McCORD, and WALLER, Circuit Judges.

SIBLEY, Circuit Judge.

The appeal is from a judgment on a jury verdict, for a balance due to a lessor by a lessee for gas royalties. A motion for a directed verdict made by the defendant Phillips Petroleum Company, and one for a judgment non obstante, were overruled. Besides this, errors are specified as to the admission of evidence and the charges and refusals to charge of the court. The main law questions arise on the construction of the royalty provision in the lease, and touching the tolling of the statute of limitation, and the allowance of interest before judgment.

The defendant's answer admits allegations in the petition that plaintiff, Clay Johnson, on June 7, 1928, made an exhibited oil and gas lease which passed to the defendant in 1937, and that defendant in September of that year completed a well which has ever since produced large quantities of gas, properly classed as "natural gas". None of it has been sold at the well, but all has been put by defendant into its own extensive system of pipe lines and mixed therein with gas from many other wells, and the mixture taken to plants of defendant where the easily liquefiable gasolene was taken out, and the residue gas sold to producers of carbon black; that monthly statements were sent Johnson of the volume of gas taken from the well with a check for the sum stated to be due; but that Johnson, though not disputing the amounts of gas, contended the payment was not correct, and would not accept the checks until on April 12, 1940, it was by letter agreed the checks should be cashed without prejudice to his rights.

McCORD, Circuit Judge, dissenting.

The petition further alleges the statements were misleading, and did not show the true quantity of liquids extracted or the residue gas sold, and the true prices at which these were sold by defendant, and that petitioner did not learn of the falsity of these statements till shortly before suit. The answer contends the monthly statements were meant to show and did show the fair market value of the gas at the well, which was the true measure of defendant's liability: that what was done with the gas after it left the well was immaterial; and the four-year statute of limitation was specially pleaded. Thus the issues are drawn.

1. The royalty provision of the lease, the meaning and application of which is in dispute, reads: "If oil shall be found on said premises, lessee shall deliver as royalty to the lessor free of expense one-eighth part of the oil saved from that produced * * * or lessee may at lessee's option buy such royalty oil, paying the *current market price in the field* at the time of production. If lessee shall operate so as to save and use casinghead gas from said premises, then lessee shall pay as royalty to lessor one-eighth part of the value of said gas calculated at *the rate of four cents per thousand cubic feet* of the casinghead gas. * * * If any well on said premises shall produce natural gas in paying quantities, and such natural gas is *used off the premises or marketed by lessee,* then lessor shall be paid at the rate of one-eighth of *the net proceeds derived from sale of gas at the mouth of the well.*" (Italics added).

No oil was found. No casinghead gas was in fact produced, though the monthly statements appeared to be for that until after March, 1938. It is now conceded that only natural gas has ever been produced. The entire royalty agreement is quoted to show the care with which terms were used. As to oil, an eighth of the oil itself was to be delivered in kind, with an option to the lessee to buy it back at *market price.* Gas cannot well be divided and delivered in kind, so the more valuable casinghead gas, if any, was to be kept by the lessee, he paying a *fixed rate* of four cents per MFC irrespective of the current market price or value. The natural gas is less clearly dealt with. It is to beget a royalty only if "used off the premises" or "marketed" by lessee, who then shall pay an eighth of *"the net proceeds derived* from gas at the *mouth of the well."* As to it there is no mention of either market price or market value, or a fixed price, but of *net proceeds,* which generally means the receipts, less expenses, of an actual sale. If this gas had been sold "at the mouth of the well" there would be no difficulty in applying the words, but the lessee took it away from the premises to its gasolene plant and "used or marketed" it there. There were no net proceeds derived at the mouth of the well. But if the raw gas had been sold at a market off the premises, the net proceeds at the mouth of the well might well mean the actual proceeds less the expense of transportation. Now it was transported in a mixture with gas from other wells, the condensable liquid was separated out, and the residue (the evidence shows about 97 percent by volume), sold to others for making carbon black. The liquid extracted was then put through more complicated processes of manufacture to make many refined or blended hydrocarbon products which were in turn sold by lessee. The plaintiff does not here contend that he can follow the liquid into these manufactured products and have an account of their sale, but he does contend that in such manufacture the liquefied elements of his gas were "used" by the lessee, and since this prevented there being any "proceeds" by sale, the account ought to be of the fair value of the liquid; and there ought to be an account of the actual proceeds of the residue gas, rendered "net * * * at the mouth of the well" by allowing for the cost of transportation and separation. On the other hand the defendant contends that it "used" the gas as soon as it left the well by mixing it with other gas, and it should account for its fair market *value* at the mouth of the well since there were no *proceeds* derived there.

The law often resorts to "fair value" or "fair market value", when "market price" is stipulated and there is no market,[1] or when "proceeds" are stipulated and there is no sale. This is because the contract evidently intends payment shall be made, and value is the nearest approach possible under the circumstances to the measure of payment contracted for. In so far as this gas was "used" there can be no "net proceeds derived at the mouth of the well" and fair value must be resorted to. In so far as the gas was "marketed" we think the stipulation for a share of the "net proceeds

---

[1] The proper difference in the terms, not always observed even by judges, is drawn in Shamrock Oil & Gas Corp. v. Coffee, 5 Cir., 140 F.2d 409.

derived" ought to be enforced, effect being given to the words "net at the mouth of the well" by allowing as expense the cost of transporting, separating, and marketing. This lessor did not consent to be left to the uncertainties of "fair value", or even "market price", as to the gas but was willing to take one-eighth of what the lessee sold it for, relying on the lessee's self-interest to secure a good sale. We think the mere mingling of this gas with other similar gas does not amount to a "use" of it. There is testimony that there is not much difference in the gas from the various wells in the vicinity. As we shall soon see, the lessee thought them near enough alike to treat this gas as average gas, and to calculate its returns as in proportion to volume in the statements rendered. Nor do we think the condensation of the gasolene vapors from the gas is a "use" of it within the meaning of this contract. About three percent of the volume of the gas was thus separated out, but only its physical state was altered. If allowed to evaporate it would become again just what it was. But when this liquid was by more intricate processes further altered and separated and blended into other hydrocarbon compounds, it might well be considered a "use" in manufacture, so that "proceeds derived" from the sale of the products cannot be followed in the account, and only the fair value of the condensed liquid before manufacture can be considered, it having been used and not sold.

■ This is the very interpretation put on the contract by Phillips Petroleum Company in the statements it rendered Johnson after March, 1938. They did not purport to account for the gas at its value at the mouth of the well, disassociated from everything that happened after it left there. They are headed, "Statement of gas purchased". After identifying the well there follows, "Clay Johnson, owner or owners *whose share* is computed hereon". The volume of the gas metered from this well is then stated, and "Residue value of the Gas", figured by obtaining the *proportion* from this well compared with the total gas handled during the month, under the heading "Meter Station proportion of total residue *sold* from plant"; and then "50% of *net proceeds* from total residue *sold* from plant, and lastly, "Meter station residue *net proceeds*", being the figure credited to Johnson on account of residue gas for that month. Then under the head *"Gasolene Content value of the gas"* there is a figuring of gasolene content by use of the *same proportional fraction,* and a price per gallon, resulting in a figure called "Meter Station *gasolene content value"*. Both credits are combined under the head "Total Meter Station *residue net proceeds* and *gasolene content value* after tax", for which check was sent Johnson. This we think plainly shows that, notwithstanding the mingling of this gas with other gas, the defendant understood it was accountable for the *value* of this gasolene liquid it separated out and used, and for the net *proceeds* of the residue gas which it *sold*. The 50% reduction in the proceeds of the residue, and a percentage reduction in the gasolene value also, are explained as estimated charges to cover expenses. We hold that as applied to the defendant's handling of this gas the measure of accountability is one-eighth of the *fair value* of the gasolene separated out and used, and one-eighth of *the proceeds of sale* of the residue gas, less a proper credit for the cost of transportation, separation, and sale.

2. The motions touching the verdict are based on the fact that the market price or value of raw gas at the mouth of the well was not proven. Under the view we have taken of the proper rule for the accounting such evidence was not necessary or pertinent.

■■ 3. As to error in the rulings on evidence, the evidence as to how much carbon black Huber made out of his residue gas was immaterial. As we understand the case, defendant actually sold the residue gas, and is accountable for the actual net proceeds only, whether the residue gas was worth more or less. The contract between defendant and Columbian Carbon Company for the sale of residue gas covered part of the period in controversy. It would appear to be relevant on the question of what price defendant actually got for residue gas.

■ The account for the gasolene extracted is another matter. That was not sold but used, and the question is not of *the proceeds* but its *fair value*. The quantity defendant says it extracted may be challenged, and checked against what might reasonably have been extracted. The objections made to evidence on this line are not clear and concrete enough for us to rule more specifically on them. Defendant's contract with Panhandle Eastern Pipe Line Company to extract the gasolene vapors from the latter's gas would seem to

bear upon the fair allowance proper to be made for the cost of this operation.

■ 4. The court submitted the case to the jury in general along the lines we have decided to be proper. The reference in the charge to defendant being in a trust relation to the plaintiff was inapt in a law case, because only a court of equity will declare the existence of an implied, constructive or resulting trust.[2] This is not a suit in equity to have the defendant declared to be a trustee of one-eighth of the net proceeds received from the gas, with the consequent duty of such trustee to faithfully and fully account. It was tried by a jury as a suit at law for a debt arising out of a contract wherein the plaintiff retained no title to the one-eighth part of the gas here involved, but only a right to share in its net proceeds. Under Texas law plaintiff had no title to any of the gas, and the contract created no express trust. Assuming, but not deciding, that equity would declare that a trust existed as to the one-eighth of the net proceeds for which the defendant as such trustee would be required to account to the lessor, nevertheless, it was inappropriate *in a case at law* to give to the jury the charge that "In acquiring said lease providing for payment of one-eighth of the net proceeds derived from the sale of gas at the mouth of the well, a trust relationship was created." Under the federal Constitution, art. 3, § 2, the distinction between law and equity is to be observed.

■ In one part of the charge the court told the jury that the amount due the plaintiff might be arrived at by determining the fair and reasonable value of the raw gas at the gasolene plant, less a reasonable charge for transportation. In another part they were told their aim was to ascertain upon relevant factors the net proceeds derived from the gas at the mouth of the well, making full allowance for any appropriate deductions from gross proceeds. These seem rather confusing, if not contradictory,

instructions. We think the simple rule stated at the conclusion of subdivision 1 of this opinion will be sufficient on another trial.

■ 5. Gas production began in September, 1937. This suit was filed May 24, 1944. The four-year statute of limitation concededly applies. Items arising prior to May 24, 1940, are *prima facie* barred. Concealment of the facts by the defendant is relied on to estop from pleading the statute. The concealments are claimed to lie in the inaccuracy of the monthly statements. Johnson is an elderly physician living in Fort Worth at quite a distance from the field. The defendant shortly after the well was completed wrote him about it, and the "utilization of the casinghead gas" from it, advising that a pipe line was being laid by it. The monthly statements through March, 1938, were headed statements of casinghead gas utilized, which gave the "raw gas produced" and the "Code test gallons" taken from it, and a price per gallon, at first .0434, but drifting down the last two months to .0194 and .0245. Johnson, believing that casinghead gas was in question, refused the checks, demanding the price fixed in the lease. The monthly statements thereafter were on the form described above, dealing with *value* of gasolene content and *net proceeds* of residue gas. It was not till April 12, 1940, that the checks were agreed to be cashed without prejudice. It does not clearly appear at what date Johnson learned that the gas was not casinghead gas, but natural gas. So long as he was told that it was casinghead gas he might well think that what liquid it contained and its price was immaterial, for he was entitled to four cents per thousand cubic feet of gas, and nothing but volume mattered. He may thus be thought during that time to have been kept in ignorance that he had any claim for natural gas, to be paid for on a different basis. He testifies that he learned of the falsity of the statements as to content and

---

[2] In Valdes v. Larrinaga, 233 U.S. 705, 34 S.Ct. 750, 751, 58 L.Ed. 1163, it was said: "But whether the contract created a partnership under the definition of the Civil Code * * * or not, it gave the appellee an equitable interest in the concession to the extent of securing his share of the profits, if any, and attached to these profits specifically if and when they came into being. Barnes v. Alexander, 232 U.S. 117, 121, 34 S.Ct. 276, 58 L.Ed. 530. It established a fiduciary relation between Valdes, who had legal control, and the plaintiff. The bill alleges an abuse of the relation by a secret transaction from which it is alleged that the profits accrued. It is a proper case for equitable relief."

In Barnes v. Alexander, 232 U.S. 117, 34 S.Ct. 276, 278, 58 L.Ed. 530, the Court said: "And it is one of the familiar rules of equity that a contract to convey a specific object even before it is acquired will make the contractor a trustee as soon as he gets a title to the thing."

proceeds of natural gas when he employed attorneys shortly before suing, but he also said: "I discovered it a long time ago but didn't have any way of proving it."

■ The Texas law is thus stated in 28 Tex.Jur. 164, 165: "Nothing is better settled than the rule that the fraudulent concealment of a cause of action by the defendant, accompanied by the plaintiff's failure, after exercising ordinary diligence, to discover the concealment, will avoid the bar of the statute of limitations. The reason of the rule is that a party cannot in good conscience avail himself of the statute when his own fraud has prevented the other party from knowing his rights." So also is Owen v. King, 130 Tex. 614, 111 S.W.2d 695, 697, 114 A.L.R. 859, and 34 Am.Jur., Limitation of Actions, § 234. It was the lessee's duty to know and to report truly the volume of gas it was taking out, and the disposition made of it, and the net proceeds if sold, for the facts were within its own knowledge. This duty greatly reduces the diligence necessary on the lessor's part to inform himself. In Hickok Producing & Development Co. v. Texas Co., 5 Cir., 128 F.2d 183, 185, we considered the effect of misleading statements by a lessee as affecting limitation and said: "The law of Texas is well settled on this point. 'Mere failure of a party to disclose a fact is not necessarily fraudulent concealment, but only silence is permitted. Any statement, word or act which tends to the suppression of the truth, renders the concealment fraudulent.' (citing authorities) * * * If, in this case, the defendant had made no statements at all of amounts due or had made the statements show that defendant was being paid only for ⅛th of ½ instead of for ⅛th of the whole, the statute would not have been tolled. When however, statements are drawn and settlements are made, as here, so as to create the impression that payments are being made in accordance with the contract and plaintiff is, as here, deceived by these positive acts of defendant, there is the concealment which tolls the statute." In this case Johnson had the burden to show concealment which deceived him and prevented a timely suit, and how long it continued. When he knew the statements were not true the concealment ceased to be effective, and the statute began to run. He could not wait to acquire better proofs, but should sue and then use the implements the Rules of Procedure provide for extracting from the opposite party and others the

full truth. He cannot wait more than four years to investigate. Johnson did not make clear the date he ceased to rely on the truth of the statements, or indeed that he ever really relied on them. Certainly the case required a full, clear charge on the law involved, and that given was very brief. It made the statute inoperative till Johnson "had *knowledge of the facts* constituting his cause of action." The jury must have thought this meant full and detailed knowledge, for they gave no effect at all to the statute. We do not understand that full and precise knowledge is requisite. That has not yet been attained perhaps. It is enough for one to know that he has a cause of action, and that representations which before concealed it are not true. A concealment which no longer conceals the cause of action will not continue to toll the statute, though the full facts may not yet have been disclosed. Under the present evidence the verdict is not right as respects limitation.

■ 6. Six percent interest on each monthly balance to date of verdict was added by the jury by direction of the court, duly objected to. The statute, Rev.Civ. Stats. art. 5070, provides: "When no specified rate of interest is agreed upon by the parties, interest at the rate of six percent per annum shall be allowed on all written contracts ascertaining the sum payable, from and after the time when the sum is due and payable." This might mean that only written contracts which on their face state the amount to be paid are included; but in Federal Life Ins. Co. v. Kriton, 112 Tex. 532, 249 S.W. 193, 195, it was held: "It is sufficient to come within the meaning of the statute if the contract provides the conditions upon which liability depends and fixes a measure by which the sum payable can be ascertained with reasonable certainty, in the light of the attending circumstances." But in Keystone Pipe & Supply Co. v. Zweifel, 127 Tex. 392, 94 S.W.2d 412, though a written contract fixed the quantity and quality of certain well casing which was agreed to be replaced but was not, it was held that the value of it was dependent on testimony and was unliquidated, and no interest before judgment was recoverable. Under the evidence now before us, we think the amounts due for the fair value of gasolene taken from the gas and used by defendant from month to month was unliquidated and bears no interest till ascertained, under the rule in the

Zweifel case. On the other hand, the proceeds of the gas which was sold as residue ought to bear interest, for defendant knew the gross proceeds, and could with reasonable certainty ascertain the expense it had gone to in transporting and separating and selling it. Interest ought to be allowed on the net proceeds according to the Kriton case.

We have not discussed the meaning and effect given royalty provisions in the many cases cited to us, because in none were the words and the facts like this case. We have not referred to the evidence in much detail, because the defendant introduced none, and that for plaintiff may de different on another trial, in view of the legal conclusions we have announced. For the reasons stated there should be a new trial; and to that end the judgment is reversed, the verdict set aside, and the cause remanded for further proceedings.

Reversed and remanded.

McCORD, Circuit Judge (dissenting).

When gas was brought in on the property of the plaintiff the defendant laid pipes to the well and commingled the gas in the pipes with the gas from many other wells in the Panhandle Gas Field, and conveyed it through the pipes to distant points where it was partly used and partly sold, after certain treatment of the raw gas. That is, the defendant used a part of the raw gas by certain treatment and thereafter it sold the residue for different and other purposes. The evidence leads to the conclusion that it was the refuse which was sold.

That part of the lease contract which is important here provides: " * * * If any well on said premises shall produce natural gas in paying quantities, and such natural gas is used off the premises or marketed by lessee, then lessor shall be paid at the rate of one-eighth of the net proceeds derived from the sale of gas at the mouth of the well."

It becomes evident that since there was no market price to be found at the mouth of the well, plaintiff was entitled to receive the fair market value of one-eighth of the net proceeds, which means the receipts less expenses of removing the gas to where it was used. My brothers seem to lose sight of that part of the contract, "and such natural gas is used off the premises or marketed by lessee, * * *." The evidence is without dispute that the defendant used the gas off the premises and what I earnestly contend is that when this gas was removed from the well and commingled with the gas from other gas wells, at that time the defendant used the gas and immediately owed the plaintiff the fair market value therefor.

My contention can best be shown by this illustration: A dairyman purchased one ton of raw milk to be used by the dairyman or to be resold by him. The dairyman takes over the milk and immediately uses a part of it for cream, then he manufactures butter, and then sells the residue for the purpose of making cheese. Can one conclude that the seller of this milk should be compelled to stand by and wait until the dairyman used and sold the different products which he had manufactured from the milk? Certainly not. When he took possession of the milk and commenced to use it he owed for it then and not after he had sold portions of it.

The majority opinion requires the plaintiff here to wait until the defendant removes the gas from the well, commingles it with other gas, and then uses it at distant points where defendant's plants are located, and after it is used in many ways by defendant, plaintiff must further wait until a sale is made of the by-products or refuse. Suppose defendant consumed one entire year in using the gas, must plaintiff wait until the year has passed and until the residue gas is sold? The contract speaks the answer when it provides that when the gas is removed and "used off the premises" (not sold) the plaintiff is entitled and is to be paid after deducting expense for removal the fair market value therefor.

Here it becomes patent, and in fact stands above dispute, that all the gas was taken from this well by defendant and piped away to other and distant points. Thereupon, the burden rested squarely on the plaintiff to go out into the field and ascertain and find out and bring in the fair market value, that is, what sellers and purchasers would likely agree on as a price. That is exactly what the plaintiff did. He not only made out a prima facie case, but much more. The burden thereupon shifted to the defendant to go forward with the evidence. It was the duty of the defendant to show good faith, and to make a full and complete disclosure of all and every transaction with reference to the gas in question; that is, to make a full, complete and honest accounting. Selma, Rome & Dalton R. Co. v. United States, 139 U.S. 560, 561-568,

11 S.Ct. 638, 35 L.Ed. 266; Miller v. Lykes Bros.-Ripley S. S. Co., 5 Cir., 98 F.2d 185; Manufacturers' Finance Co. v. Marks, 6 Cir., 142 F.2d 521, 527.

It is not enough for the majority opinion to remain silent and decline to point out the duty of the defendant for the reason that no objections were made by plaintiff when the defendant declined to offer evidence. Many times the courts have held where no objection or assignment of error has been made that nevertheless in the interest of justice courts will pass upon and point out patent errors. White v. United States, 5 Cir., 202 F. 501; United States v. Tennessee & C. R. Co., 176 U.S. 242, 20 S.Ct. 370, 44 L.Ed. 452; Hickman County v. Nashville Bridge Company, 6 Cir., 66 F.2d 174. Furthermore, since the case must go back for another trial, the trial court should be advised of the legal evidence which should be submitted and which has just been adverted to. It is just as essential to point out as a guide to the trial court the legal evidence and the *burden of proof* as it is to inform the court on how to arrive at the fair market value of the gas.

The court in charging the jury charged on the law as to a trust, but if this was error it was certainly error without injury, for he thereafter charged very clearly and concisely just what the issue was which they were to pass upon. Moreover, the charge of the court on the question of the statute of limitations was certainly sufficient. The statements presented each month are admittedly misleading and were relied upon up to the time of the bringing of this suit. I quote an excerpt from the evidence of the plaintiff:

"Q. When did you first learn the value of your gas was less than they show under this statement and what amount of the difference? A. You mean what I first learned definitely, you might say?

"Q. As being reported less than actual value, when did you first learn that they were reporting it less than what it is now contended by you to be the actual value? (Here counsel for defendant interposed this objection: 'We object for the reason that every man is presumed to know that the value here, that the market value of gas—a man who lives in California is presumed to know what the value is.')

"Q. When did you first learn that the gasolene content of your gas was in excess of what these reports show? A. I think

after I employed you as my attorney, probably.

"Q. Which was a few months back? A. Yes, sir."

These statements show conclusively that only casinghead gas was being produced by the well on plaintiff's land, and since the lease contract provided that plaintiff was to receive 4¢ per thousand cubic feet for such gas, he relied upon these statements almost up to the time of the bringing of this suit. Clearly the statute of limitations was tolled. Furthermore, if error was made as to calculation of interest, it should be corrected here.

The answer of defendant in paragraph 12 substantially admits that the duty rested upon it to make a full and true accounting of the proceeds of the gas sold. This it refused to do, although it knew accurately just how much gas had been taken from the well, the kind of gas taken, when taken, where taken, and exactly the removal cost and its fair market value. Now, when the issue has been cast against it, the defendant comes to us and in effect says, "I know it was my duty to come forward and account faithfully, fully and honestly for the amount of gas I received from my well on plaintiff's land, but I was not willing to do this."

Defendant stands like unto the boy who killed his father and mother, and when he stood for sentence before the court, begged for mercy on the ground that he was an orphan.

However, the majority opinion grants a new trial and rewards defendant notwithstanding its dereliction.

The judgment should be affirmed.

SIBLEY, Circuit Judge.

Each party has moved for a rehearing, but neither has convinced us that anything in the opinion is wrong. To prevent misunderstandings, however, we will further state our views on some points.

1. The contracts in some other cases pressed upon us spoke of the making of gasoline from the gas as the "use" to be made of it. Such being the express agreement, it was a use of it under those contracts. At a previous time when such gas was drained of its gasoline and the residue thrown away, this being the only use for the gas, very likely gasoline extraction was generally spoken of as using the gas.

These parties before us knew that under present Texas conservation laws the gas could not be thus thrown away in great part, and that it is now the common practice to do what was done with this gas, when a sale to the pipelines for light and fuel could not be made. What *they meant* by the term "used" is illustrated by their circumstances, and especially by their conduct under this contract. Johnson knew that Phillips was putting the gas from his well into Phillips' pipeline, condensing the gasoline vapors out, and selling the residue, and has never objected. We are clear that thus mingling the gas with similar gas for convenience in transportation was not using it. Putting aside the early months when casinghead gas was thought to be involved, Phillips has monthly rendered statements to Johnson which did not on their face purport to be for the value of the gas at the mouth of the well, as Phillips now contends would be proper, but they purported to show the amount of gasoline taken out and its *value* and the *proceeds* of sale of the *residue,* with deductions from both supposedly for expenses. Johnson has never contested this *basis* of *accounting,* or that it was proper to treat the gas from his well as average gas in the mixture dealt with. He has claimed and now claims only that more gasoline was taken out than was stated, and that it was worth more, and that the proceeds from the residue were more than stated, and that the deductions for handling were too much. In his last filed brief he states: "All the plaintiff seeks is the value of the gasoline content and the net proceeds of the residue. He is willing to allow all reasonable expenses in separating the gas into usable commodities." This substantially recognizes the basis of accounting which we have established, and it is the basis indicated, so far as the present record shows, by the monthly statements rendered. The correctness of the debits and credits constitutes the matter for trial.

2. We have not said this petition might not have been treated as one in equity and tried by the judge, with the nomenclature and mechanics of equity. We say an account between persons jointly interested as these are can be had at law, 1 Am.Jur., Accounts and Accounting, § 43, or in equity, Id. § 51. There is not much, if any, difference in the principles or results of either procedure. Id. § 49. What we said is that a jury was demanded as in a law suit and the demand was acquiesced in, and the trial had was that of a law suit, in which it is best not to confuse the jury with equity terms and concepts. In a law trial, discovery can now be had from the defendant by interrogatories, or by taking depositions of its officers, and agents. We have made no rulings on the burden of proof because none were made in the court below or invoked here. It would seem, however, as we have already said, that the defendant, following proof or admission that it has used gasoline vapors out of the gas, and has sold the remainder, ought to show the amount of each for every month, and what the proceeds were of that sold, for these things are peculiarly in its knowledge, and as the accounting party it ought to have a record of them or bear the inconvenience of its failure to keep it. So as to the deductions for expense of handling the gas. If the expense cannot be accurately shown, of course, customary charges for such service or even opinion evidence from witnesses, qualified to testify about it, may be resorted to. The question as to the market value of gasoline is a matter open to the information of both parties, and if the plaintiff disputes the value put on it by defendant he may show it to be wrong by evidence. So he may rebut by evidence any item of receipts or expense set up by the defendants. We do not understand the assertion that the proceeds of the residue gas cannot be proven and therefore the value of this gas can be shown by showing what Huber got out of such gas. Surely both Phillips and the purchaser of this gas have records of what was paid, the gross proceeds. If the proceeds can be arrived at, the worth of the gas is, under this contract, immaterial. We have not examined the pleadings to see just how the issues are made, but have spoken generally as to how it seems to us these parties ought to approach a solution of their differences.

3. As to the statute of limitations, the cause of action is not a fraud but breach of a contract to pay money. The appropriate limitation began to run against each installment as it fell due. If there was any concealment of any part of that cause of action which was fraudulent the statute would not run while the concealment continued. The burden is on Johnson to show the facts necessary to relieve him

of the bar of the statute. He knows whether and when and how long he was deceived and must make that clear. The testimony he delivered was not at all clear, but was, as we pointed out in the opinion, ambiguous if not self-contradictory. Perhaps he can clarify the matter on another trial.

Both motions for a rehearing are denied.

McCORD, Circuit Judge, dissents.

On Second Motions for Rehearing.

SIBLEY, Circuit Judge.

Each party has asked for leave to file a second motion for rehearing. Our rules do not provide for this, but as a new trial has been ordered and the parties have each thought we misunderstood the situation, we have considered these motions and will again state our views on the point now put forward.

That point is, that the gas mixture into which the gas from Johnson's well was put by Phillips, was taken to several gasolene extraction plants which did not extract a uniform grade of gasolene, even at the same plant, and that the residue gas, which was sold to more than one buyer, was in consequence of varying richness and price. Both parties agree that it is impossible to tell how much gasolene was taken at any plant from the Johnson gas, and how much Johnson gas was included in any day's sales of residue. Johnson thereupon insists that he is entitled to an account of the most gasolene that could reasonably have been extracted from gas from his well if it had been handled separately, and of the proceeds of the residue gas thus made if it had been separately sold for its true carbon value. Phillips on the contrary insists the result is that the words of the lease cannot under these circumstances be applied, and that market price or value of the raw gas at the mouth of the well must be substituted.

We agree with neither position. The title to the gas was in Phillips. He had a right to mingle it with his other gas for convenient and profitable handling, but he cannot set aside his contract to account for net proceeds, and by his own act make another measure of his accounting which he likes better. Johnson on the other hand has known that the gas in which he was interested was thus mingled, and in the monthly accounting was treated as average gas in the mixture, and he has acquiesced therein. In his briefs he expressly says he makes no point as to that. Probably the gas could not as a practical matter have been handled otherwise than as a part of a mixture. After the commingling it is of course impossible to follow the Johnson gas separately, or to say how much gasolene was taken from it, or what its residue sold for, separately. When the mixture of average gases is lawfully brought about, the Johnson gas no longer exists separately; but those interested in it acquire a corresponding interest in a proportion of the mixture. If for example the Johnson well during a month's accounting period furnished one percent of the mixture handled, Johnson would be entitled to an account of one-eighth of one percent of the net proceeds of the mixture. Phillips each month figured in his statements the proportional fraction of the mixed raw gas handled which was attributable to the Johnson gas. Johnson does not question that fraction. We are holding that Johnson is entitled to an account of one-eighth of that fractional part of all the gasolene made that month from the gas mixture, no matter what the grade or grades of the gasolene nor in how many extraction plants it was produced. This gasolene was not sold, so we hold as to it there are no proceeds; and its value must be substituted. Johnson is also entitled to an account of one-eighth of the fractional part of the net proceeds of residue gas sold that month from the mixture, no matter what its grade or how many its purchasers. We repeat that the basis of accounting followed by Phillips in his monthly statements is correct. The questions to be litigated are whether the debits and credits shown are correct in amount.

It seems to all the court that Phillips as the accounting party ought to produce his records and explain how the questioned figures were arrived at. It is asserted that in another case with another royalty owner it has appeared that there are no adequate records. We cannot go into another case to decide this one. In the former trial Phillips made no showing or explanation whatever. Serious presumptions sometimes arise against a person who is bound to make an account if he keeps no books or vouchers and produces no other satisfactory evidence of the account. And the scope of admissible evidence may be

thereby widened. A majority of the Court think it best not to anticipate such a situation or enlarge on it now.

These second motions for rehearing are denied.

McCORD, Circuit Judge, dissents.